Robert GORHAM, Petitioner-Appellee,

v.

Gayle FRANZEN, Director and James Greer, Warden, Respondents-Appellants.

No. 83–3159.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 24, 1984.

Decided April 23, 1985.

Rehearing Denied June 3, 1985.

Cudahy, Circuit Judge, filed dissenting opinion.

Neal B. Goodfriend, Atty. Gen. of Ill., Chicago, Ill., for respondents-appellants.

Martin Carlson, Chicago, Ill., for petitioner-appellee.

Before BAUER, WOOD and CUDAHY, Circuit Judges.

BAUER, Circuit Judge.

This case presents us with the second appeal in this habeas corpus action, in which the district court has twice granted the writ. In its first order in this case granting the writ, the district court reviewed the state court record and concluded that Gorham's confession was obtained in violation of his fifth amendment right to remain silent under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). On appeal, this court vacated the district court's order and remanded the action for an evidentiary hearing to determine whether Gorham had invoked his right to remain silent prior to questioning by the police. *United States ex rel. Gorham v. Franzen,* 675 F.2d 932 (7th Cir. 1982) (*Gorham I*). On August 23, 1982, the district court held an evidentiary hearing and on June 29, 1983, again granted the writ of habeas corpus. After a thorough review of the record in this case, we reverse.

## I. FACTS

### A. Procedural History Of This Case

Robert Gorham was arrested on April 2, 1976, for the murder on January 10, 1975, of Kenneth Thompson. Also arrested on April 2 in connection with the murder was Kenneth Thompson's wife Kathleen. On the night of his arrest, Gorham was interrogated by several officers. During the interrogation Gorham agreed to confess to the murder. A court reporter was brought in to take Gorham's confession. The questions and answers which comprised Gorham's confession amounted to a 42-page transcript. During a motion to suppress the confession at the state trial, Gorham contended that the confession was the product of a psychological coercion because of alleged threats of prolonged imprisonment, the denial of methadone for Gorham's detoxification, and promises of leniency. Because Gorham made no assertion at the state suppression hearing that he had invoked his right to remain silent prior to answering the questions which resulted in his confession, the focus of the suppression hearing was on the voluntariness of the confession. The trial court denied the motion to suppress and the government used the confession and its contents as part of its evidence against Gorham. The defendant was convicted by a jury and sentenced to a term of 100 to 200 years imprisonment.

Gorham appealed his conviction to the Illinois Appellate Court. *People v. Gor-*

*ham,* 66 Ill.App.3d 320, 23 Ill.Dec. 370, 384 N.E.2d 6 (1978). Gorham based his appeal on the ground that he had not knowingly and intelligently waived his right to remain silent and therefore the trial court had improperly denied his motion to suppress his confession. The Illinois Appellate Court affirmed the conviction, holding that based on the entire record of the case and the circumstances surrounding the confession, Gorham did not "manifest a desire to terminate the questioning." 66 Ill.App.3d at 324, 23 Ill.Dec. at 374, 384 N.E.2d at 10. The Supreme Court of Illinois denied Gorham's petition for leave to appeal. *People v. Gorham,* No. 51683 (Ill. March 29, 1979).

On August 27, 1980, Gorham filed a petition for writ of habeas corpus in the district court pursuant to 28 U.S.C. § 2254. On April 17, 1981, the district court found that the Appellate Court's determination that Gorham had not clearly invoked his right to remain silent was not fairly supported by the record of the evidentiary hearing held by the Illinois trial court. The district court thus granted the writ and remanded the cause to the state courts for a new trial.

In *Gorham I,* a panel of this court vacated the writ and remanded the cause to the district court for further evidentiary hearings on the issue of whether Gorham had unequivocally expressed his desire to remain silent, and thus asserted his right to cut off questioning. 675 F.2d at 937. We remanded because the suppression hearing in the state trial court on which the district court based its conclusion was developed with the intention of determining whether Gorham's confession was the result of psychological coercion and not with the intention of determining whether Gorham had equivocated in asserting his *Miranda* rights. We found that certain ambiguities in the state court record necessitated further evidence to clarify these ambiguities. The determinative factual question in this case is whether Gorham did or did not refuse to make a statement to Officer Douglas Barger at the time of his arrest, and if he did refuse, was the refusal to talk only to Barger or a refusal to make any statement pursuant to his fifth amendment rights under *Miranda.*

### B. State Suppression Hearing

The evidence from the state court's suppression hearing basically showed the following facts. On the day of Gorham's arrest in Peoria, Illinois, he was brought to Chicago, arriving at approximately 9:30 p.m. During the trip from Peoria, no one questioned the defendant. Gorham was taken to Assistant State's Attorney Ken Gillis' office by Officers Carl Kuester and Joseph Robustelli. In Gillis' office, Gorham was left in the custody of Lieutenant Douglas Barger, Assistant State's Attorneys Thomas Helsel and William Prendergast, and Illinois Bureau of Investigation (IBI) Agent Thomas Naughton.

Barger testified during the suppression hearing that he recited to Gorham his *Miranda* rights, that he asked Gorham if he wished to make a statement, and that Gorham responded that he did not want to make any statement at that time. According to Naughton's testimony at the suppression hearing, Gorham responded to Barger by stating that the murder charge

> was a pretty heavy beef, he is not quite sure whether or not he would want to make a formal statement, that he did four years at Menard and there was plenty of people at Menard who were there only because they did give statements and he then said he is not quite sure whether he would want to go that route.

675 F.2d at 933. Helsel testified as follows on cross examination to the defendant's questioning:

> Q. Now during this period of time, that 10 or 15 minutes, Mr. Gorham declined or refused to make a statement, isn't that correct?
>
> A. To the best of my recollection, yes.

State Tr. 135.

Shortly thereafter, Barger and Helsel left Gillis' office, spoke to Kuester and Robustelli, who subsequently continued to interrogate Gorham. Kuester again gave Gorham his *Miranda* rights; Gorham made no response. Robustelli then began to in-

terrogate Gorham and told him of the evidence that they presently had against him. Robustelli testified under cross-examination about Gorham's initial statements to him:

Q. And when you initially told him what you had did he decline to make a statement, did he say I don't want to make a statement?

A. He didn't say anything.

Q. What was the first thing he said to you at this time in the course of this conversation?

A. Kathy [Thompson] is here, that is what he said.

State tr. 29.

Kuester then testified that he advised Gorham of his rights in the presence of Robustelli, and that Gorham stated that he understood each of his *Miranda* rights. Kuester did not testify that Gorham stated to him or Robustelli at any time that he wished not to make any statement to them. In fact, Kuester testified that when Robustelli asked Gorham if he wished to tell them about Ken Thompson's murder Gorham replied "How is that?" and shortly thereafter asked if Kathy Thompson was there at the station. State tr. 44.

### C. District Court Rulings

The district court in the first action in this cause determined that other substantial evidence in the record contradicted the Appellate Court's determination that Gorham had not unequivocally exercised his right to remain silent. The district court relied on Barger's statements on cross-examination at the suppression hearing, including the following statements:

Q. What did you do after you read him his rights?

A. I asked him would he like to make a statement regarding this charge.

Q. He said no, is that correct?

A. He said no.

State tr. 87. The district court also relied upon Helsel's cross-examination statement that to the best of his recollection Gorham refused to make a statement. State tr. 135.

In addition to these statements the court found that the confession was involuntary because of the police conduct in bringing Mrs. Thompson into the interrogation room and in presenting the defendant with the evidence that the police had against him at that point.

A panel of this court vacated this ruling by the district court because we felt that the record on which the district court based its conclusion inadequately addressed the factual question before the district court. We determined that further testimony was needed to properly determine whether Gorham "declined" to make a statement at that time, in the sense of equivocating, or whether he was indeed "invoking" his right to remain silent.

On August 23, 1982, Judge Moran held the evidentiary hearing at which Gorham and the Police Officers and Assistant State's Attorneys present the night of Gorham's arrest testified as to the nature of Gorham's statements that evening. Essentially, Barger, Helsel, and Naughton all testified at this hearing that when Barger asked Gorham whether he wanted to make a statement, Gorham responded that he did not "want to talk to you," which each of them understood to mean that Gorham wished only not to speak to Barger. Hearing on remand tr. 26, 51, 99–100. In addition, Barger and Robustelli testified that when Barger came out of the office after talking to Gorham, Barger told Robustelli that "[Gorham] doesn't want to talk to me." Remand tr. 76, 80. Gorham testified, as he had at the pretrial hearing, that he told Barger he did not want to make a statement. State tr. 179; Remand tr. 16, 130.

On June 29, 1983, the district court granted Gorham's writ of habeas corpus. In granting the writ, Judge Moran rejected the testimony which the Police Officers and Assistant State's Attorney presented at the hearing on remand from this court. His rejection was based upon the fact that the evidence from the state court's suppression hearing was given shortly after the events in question, and because he "viewed with

hesitation some of the testimony by the officers and other witnesses because six years later they had a rather precise recollection of phraseology ... considerably different from the phraseology that they testified to shortly after the events, when the questions were pretty direct." Remand tr. 165, 167. Judge Moran attributed this difference to his belief that in this case "the wish is the father of recollection ... [where the state's witnesses] redefine[d] the past to explain the present." Remand tr. 168.

## II. WAIVER

■■■ The question of whether a defendant has waived his *Miranda* rights is one of fact, and a trial judge's findings of fact regarding a defendant's waiver will not be overturned unless clearly erroneous. FED. R.CIV.P. 52(a); *United States ex rel. Henne v. Fike,* 563 F.2d 809, 813 (7th Cir.1977), *cert. denied,* 434 U.S. 1072, 98 S.Ct. 1257, 55 L.Ed.2d 776 (1978); *United States* ex rel. *Gates v. Pate,* 355 F.2d 879, 881 (7th Cir.1966). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake his been committed." *United States v. Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). To be clearly erroneous, the district court's finding must be implausible "in light of the record viewed in its entirety." *Anderson v. City of Bessemer City,* — U.S. ——, ——, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). Moreover, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.*

Pursuant to this court's opinion in *Gorham I,* Judge Moran held an evidentiary hearing. In again granting the writ, Judge Moran rejected the state's theory on remand that Gorham's silence was directed toward Barger and that the state thus was justified in continuing its questioning of Gorham by other officers, after again reading Gorham his *Miranda* rights. We have reviewed the entire record in this case and are convinced on our reading of the suppression hearing transcript and the testimony given on remand from this court that Judge Moran was clearly erroneous in his conclusion that Gorham had invoked his right to remain silent.

### A. Evidence On Remand

#### 1. Robert Gorham's Testimony.

At the evidentiary hearing held before Judge Moran on August 23, 1982, the state called Gorham as an adverse witness. Gorham stated that prior to April 2, 1976, he had been arrested and advised of his *Miranda* rights on seven to nine occasions. When questioned further, he agreed that it would probably be closer to fifteen or sixteen times. He stated that he had served time in Menard Correctional Center after his conviction in a case in which he had given a pretrial statement. As to what occurred upon his arrival at 26th and California on the evening of April 2, 1976, Gorham initially stated that his memory was somewhat vague. He was not sure what he actually recalled or whether he was just remembering testimony from prior transcripts.

Before being arrested on April 2, 1976, Gorham was acquainted with Chicago Heights Police Lieutenant Douglas Barger and Sergeant Joseph Robustelli. He indicated that there was no animosity or hostility between Lieutenant Barger and himself, that they had never had an argument, and that Barger had never arrested him.

Two to four other individuals were present when Gorham was first brought into Gillis' office. He had some recollection that Naughton was present. While Gorham was seated, Barger advised him of his *Miranda* rights. This was the third time that day that he had been advised of his *Miranda* rights. When asked by Barger if he wanted to make a statement, Gorham testified that he told Barger he did not want to make a statement. He had "no idea" of what he said next. However, within the first few minutes that he was in the room, Gorham had some recollection of saying something about having been at Me-

nard, that there were a lot of people down there solely because they gave statements, and that this charge was a "heavy beef."

At one point, Gorham said an attorney who was somewhat older and heavier, apparently Prendergast, came into the room and Gorham asked him what good it would do to give a statement. Additionally, after the petitioner was made aware that Kathy Thompson was in the building, he said he wanted to see her because he had a relationship with Mrs. Thompson and she was carrying his child.

Following the testimony of the officers and former prosecutors, Gorham again testified, this time in his own behalf. On direct examination, he stated that he had seen Barger at the Chicago Heights Police station on several occasions prior to April 2, 1976 and recognized Barger when he saw him on April 2, 1976. He could not remember what was first said by the officer in Gillis' office, but recalled the following:

Q. But do you recall him advising you of your rights?

A. Yes.

Q. And you do recall him asking you if you wanted to give a statement concerning the charge?

A. Yes.

Q. What was your response to that request?

A. That I didn't want to make a statement.

Q. Did you limit that to Barger?

A. I believe so. It didn't seem like— how many times do I have to say no? To every individual on the police force?

Remand tr. 130.

On cross-examination, Gorham's testimony differed from that which he had given in the morning of the hearing. He now recalled that he and Barger had words on occasion and that at one point before April 2, 1976, Barger had accused him of killing Kenneth Thompson. He said the testimony given by the respondents' witnesses had "jogged" his memory.

Gorham also said that he was not sure whether he told anyone other than Barger that he did not want to make a statement. This differed from his testimony earlier in the hearing and in the suppression hearing that he had told Robustelli and others that he did not want to make a statement. After Barger read him his rights, he was not sure who spoke next. On cross-examination Gorham admitted that Barger "asked if I wanted to seek a lawyer and did I want to make a statement and all that. I said I would let him know." Remand tr. 140.

While Gorham was sitting on a couch in Gillis' office, he asked questions about the evidence that the police had against him, reasoning that "[s]ince they were staring in my face, I figured I would try and find out something. I sure wasn't getting away from them." Remand tr. 135. Gorham admitted that in 1971 when he was arrested for attempted murder, he had given two written statements within two and one-half hours of each other.

*2. Douglas Barger's Testimony.*

Douglas Barger testified that in 1976, he was a lieutenant with the Chicago Heights Police Department and was involved in the investigation of the death of Kenneth Thompson. As of April 2, 1976, Barger was acquainted with Gorham and thought that there was mutual hostility between the two. On January 25, 1975, Gorham was in custody at the Chicago Heights Police Station. Barger spoke with him then regarding the Thompson murder and accused him of committing the murder. Following the accusation, the two got into a shouting match and Barger had to tell Gorham to sit down.

On April 2, 1976, Barger first saw Gorham at the Criminal Courts Building, 26th and California, Chicago, in Gillis' office. Barger recalled that Naughton was also in the office and that Helsel and Prendergast were present at times during a conversation which he had with Gorham. Barger said hello to Gorham and advised him of his rights. He informed Gorham that they had enough evidence to obtain a murder war-

rant. At this point, Gorham stated to Barger, "I don't want to talk to you." Barger understood Gorham's statement to mean that Gorham did not want to speak with him but might want to. talk to someone else. Gorham did talk with Naughton and Helsel about the incident being a "heavy beef," that he did not know if he wanted to give a statement and that a lot of guys were in Menard because of their statements. Barger believed that Gorham was trying to decide whether to give a statement or not. When Barger left Gillis' office, Gorham was talking with Naughton.

After leaving the office, Barger told Robustelli that Gorham did not want to talk to him. Barger told Robustelli that he could try and talk to Gorham. At the original suppression hearing in November 1976, Barger was cross-examined by the petitioner's trial counsel as follows:

> Q. What did you do after you read him his rights?
>
> A. I asked him would he like to make a statement regarding this charge.
>
> \* \* \* \* \* \*
>
> Q. He said no, is that correct?
>
> A. He said no.

However, Barger stated at the remand hearing that this was not the exact response of Gorham and that at no time did Gorham just say "no." Additionally, Barger testified that no one asked him during the suppression hearing regarding Gorham's further statements about it being a "heavy beef" and that people were at Menard because they had given statements.

### 3. Thomas Naughton's Testimony.

IBI Agent Naughton testified that on April 2, 1976, from 9:30 p.m. to a few minutes after 10:00 p.m., he was in Gillis' office with Gorham, Barger, and Helsel. Shortly after Naughton entered the room, Barger read the· petitioner his *Miranda* rights from a *Miranda* card. Barger then asked Gorham if he would be interested in making any kind of statement. In a very sarcastic tone, he said to Barger, "I don't want to talk to you." Naughton understood "you" specifically to mean Barger.

Naughton said he had the impression that Gorham did not like Barger. Helsel and Naughton then asked Gorham if he would be interested in talking to anyone else, to which he replied,

> "I don't know, man. It is a pretty heavy beef. I have done time in Menard.... There have been guys down in Menard who are doing time down there just because they talked."

During this time period, Naughton thought Gorham was mulling over whether or not he should cooperate and trying to find out what the law enforcement officers had on him. He wanted to know if Kathy Thompson was there. Barger left the room shortly after the rights were read. At one point, Helsel stepped just outside the door and was conversing with another individual.

When Gorham made further inquiries as to the evidence, Naughton disclosed some of the evidence to him. The petitioner proceeded to make some admissions to Naughton, including the fact that at times he felt guilty about shooting Thompson. Naughton popped his head out the door and told Helsel that the petitioner had made some statements. At one point in time, Prendergast entered the office. Shortly after 10:00 p.m., Robustelli and Kuester relieved Naughton. Naughton felt that at no time did Gorham ever expressly state that he wished to exercise his right to remain silent.

### 4. Thomas Helsel's Testimony.

Helsel testified that on April 2, 1976, as Assistant State's Attorney, he participated in the arrest of Gorham and his transportation from Peoria to Chicago. The transport group arrived at the Chicago station at approximately 9:30 p.m. and took Gorham to Gillis' office. Robustelli and Kuester originally were in the office with Gorham for a few minutes, but left, and were replaced by Barger, Helsel, and possibly Naughton. Helsel left the room for several minutes and returned.

Upon his return, Helsel observed Gorham asking Barger questions, and Barger informed Helsel that Gorham had been given his *Miranda* rights. When Barger asked Gorham if he wanted to make a statement, he looked at Barger and told Barger that he did not want to talk to him. At that point, Gorham began talking with Naughton regarding what evidence the police had. Naughton may have been in the room the whole time or may have entered in the middle of the conversation. While Gorham and Naughton continued to converse, Helsel walked out of the room and stood at the doorway.

### 5. William Prendergast's Testimony.

Prendergast testified that at one point on the evening of April 2, 1976, as Assistant State's Attorney, he was present with Gorham and Barger in Gillis' office. Helsel was walking in and out of the office. Also present, either in or around Gillis' office that evening were Naughton, Kuester, Robustelli, and Helsel. While in the room with Gorham, Prendergast asked Gorham if he had received his *Miranda* rights. The witness also thought Gorham was asking questions of Barger. At one point, Gorham asked Prendergast what could be done for him.

### 6. Joseph Robustelli's Testimony.

Robustelli testified that he had been a police officer with the City of Chicago Heights for twenty years. Before April 2, 1976, Robustelli had seen Gorham a number of times; several of these occasions occurred when he had been placed under arrest. Based on his observations, Robustelli thought a mutual hostility existed between Gorham and Barger.

On April 2, 1976, Robustelli accompanied Gorham from Peoria to Chicago, arriving in Chicago between 9:30 and 10:00 p.m. Robustelli and Kuester escorted him to Gillis' office. Also present were Barger, Helsel, and Naughton. (Robustelli testified at the suppression hearing that it was Prendergast not Naughton that had entered.) When the others were in the office, Kuester and Robustelli left and waited outside the office.

Approximately fifteen to twenty minutes later, Barger came out of the office and told Robustelli, "He doesn't want to talk to me." Robustelli interpreted the remark to mean that Gorham did not want to talk to Barger personally. Barger agreed that Robustelli could try to talk with Gorham.

Robustelli and Kuester then entered Gillis' office and Helsel and Naughton. Kuester gave Gorham his *Miranda* rights again. Gorham acknowledged that he understood his rights and in the conversation that followed, initially denied knowing anything about a murder. Robustelli then revealed some of the evidence against him, including the fact that Kathy Thompson was arrested and had told the police everything. When Gorham found out she was in the building, he asked to see her and she was brought into the room by Barger and eventually told Gorham that she had confessed. Gorham and Mrs. Thompson conversed by themselves for about a half hour. After she was taken from Gillis' office, Gorham gave an oral statement to Robustelli and Kuester.

### 7. Carl Kuester's Testimony.

Kuester testified that on several occasions before April 2, 1976, as a Police Officer, he had had contact with Gorham and that Barger was involved in several of the arrests. Kuester observed that Gorham did not appear to like Barger.

On April 2, 1976, Kuester had participated in the arrest of Gorham in Peoria and his transportation to Chicago. At approximately 10 p.m., Kuester took Gorham into Gillis' office and turned him over to Barger. Kuester walked out of the office and remained in the secretarial area. Kuester said that Barger, Helsel, and Prendergast were in the room with Gorham. Robustelli remained outside the office. Naughton was either inside the office or in the secretarial area.

Approximately fifteen minutes later, the individuals who were in with Gorham left

the office. Barger had a conversation with Robustelli, but Kuester was not close enough to hear. Kuester assumed that up to that point Gorham had declined to make a statement. Robustelli and Kuester entered Gillis' office. Kuester readvised Gorham of his constitutional rights and Gorham acknowledged that he knew his rights and understood them. In the ensuing conversation, Gorham inquired as to what evidence they had on him. Robustelli informed him of the evidence, including the fact that Kathy Thompson had been arrested and had given statements. When he was informed that Kathy was in the building, he asked to see her.

### B. Analysis Of The Testimony

The issue of whether a defendant waived his Miranda rights "is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived his rights delineated in the *Miranda* case." *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979). The fact of a knowing and voluntary waiver is to be determined from a review of the totality of the circumstances. *United States* ex rel. *Hall v. Director*, 578 F.2d 194, 196 (7th Cir.), *cert. denied*, 439 U.S. 958, 99 S.Ct. 360, 58 L.Ed.2d 350 (1978). As the Supreme Court stated in *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979):

> The totality approach permits—indeed it mandates—inquiry into all the circumstances surrounding the interrogation. This includes evaluation of the [defendant's] age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.

*See also Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938).

In reviewing the totality of the circumstances, it is important to remember that an explicit statement of waiver is not invariably necessary to support a finding that a defendant has waived his right to remain silent. *Butler*, 441 U.S. at 373, 99 S.Ct. at 1757. The burden rests with the prosecution to show waiver by a preponderance of the evidence, *cf. Lego v. Twomey*, 404 U.S. 477, 489, 92 S.Ct. 619, 626, 30 L.Ed.2d 618 (1972) (the government must prove by a preponderance of the evidence that a confession was voluntary), although the courts must presume that the defendant did not waive his rights. *Butler*, 441 U.S. at 373, 99 S.Ct. at 1757.

Approximately ten months after the remand hearing, the district court heard oral argument and immediately issued oral findings from the bench, granting the petition for a writ of habeas corpus. The district court accepted Gorham's assertion that he had invoked his *Miranda* rights without properly considering the totality of the circumstances. Contrary to the teachings of *Fare*, 442 U.S. at 725, 99 S.Ct. at 2572, the district court failed to mention Gorham's criminal record (other than to comment that he was a "several time loser"), that Gorham clearly understood his *Miranda* rights and the implications of waiver, that Gorham had varied his testimony between the morning and afternoon sessions of the remand hearing, and that he admitted that his recollection of his interrogation was vague. The court gave little credence, however, to the testimony of the police officers and assistant state's attorneys. The court found that their "rather precise recollection of phraseology used" at the remand hearing differed from the phraseology that they used at the original suppression hearing shortly after the event. Although the court concluded that there was not "any question ... in anybody's mind that [Gorham] deliberately killed a man" the court found that he had exercised his right to remain silent and granted the petition. The state was given 120 days to retry Gorham.

Judge Moran's rejection of the testimony presented at the remand hearing was based in part on his conclusion that because the "tension" between Barger and Gorham, which the state believed justified its conclusion that Gorham wished not to speak with

Barger only, was not alluded to at all during the suppression hearing, this tension was perhaps developed as a ruse to justify the state's belief that Gorham equivocated in his invocation of his *Miranda* rights. He thus rejected the validity of the "tension" theory.

There is an obvious reason why the tension between Gorham and Barger was never brought up at the original suppression hearing. Such evidence would have been extraneous to the purpose of the hearing to determine whether Gorham's confession was the product of psychological coercion. The evidence of Gorham's attitude toward Barger is important, however, to the issue of whether Gorham's refusal to talk on the evening of his arrest was simply because he did not wish to talk to Barger or whether he wished to make no statement whatsoever, as is his right to do under *Miranda.* The fact that this tension between these two men never arose until the remand hearing also certainly confirms the reason why this court found it incorrect for Judge Moran to have originally relied only on the suppression hearing evidence—we believed then and certainly believe now that that hearing was insufficient to present all of the evidence necessary for a proper finding on the waiver issue. We believe that it was clearly erroneous for Judge Moran to have rejected this evidence simply because it had not been mentioned at the suppression hearing.

 We think that on the record before us the state did prove by a preponderance of the evidence that Gorham waived his *Miranda* rights. From the defendant's words and actions at the time of his arrest, his waiver can clearly be inferred from the record before us. The defendant did not sign any waiver agreement, but that is not dispositive of the issue of waiver. That Gorham was given his *Miranda* warnings several times on April 2, 1976, is undisputed. Gorham also stated that he understood those rights. He also had independent knowledge of those rights, as he had had substantial contact with the criminal justice system as an adult and as a juvenile. State

tr. 210–213, 264–268. Gorham had been arrested previously thirteen times and had several convictions on this record. Gorham also manifested a clear understanding of those rights when he stated to Naughton and Barger that he was not sure if he wanted to make a statement concerning Ken Thompson's death because the charge was a "heavy beef" and that Gorham knew of inmates at Menard Correctional Institute who were there "just because they talked." State tr. 25–36, 34, 51.

Thus it is clear on the record before us that Gorham understood his *Miranda* rights. It is also clear on the record that the interrogating officers believed that Gorham understood those rights and based their continued questioning on Gorham's understanding of *Miranda* and his failure to clearly articulate a desire to remain silent. As is stated by one authority on criminal law

> [W]hen it is clear the defendant does understand his rights it is somewhat easier to make some judgments about the significance of his subsequent conduct in terms of whether or not those rights are being invoked. Thus, while an acknowledgement of understanding should not inevitably carry the day, it is especially significant when defendant's incriminating statement follows immediately thereafter.

W. LaFave & J. Israel, Criminal Procedure 310 (1985).

 We conclude, therefore, that on the record before us, the district court's conclusion that Gorham did not equivocate in invoking his right to remain silent is implausible. His failure to invoke clearly those rights, which he knew and understood, amounted to a waiver of his right to remain silent under the fifth amendment. The ensuing confession from Gorham to the murder of Kenneth Thompson therefore was not obtained in violation of *Miranda.*

### III. HARMLESS ERROR

Even if we were to decide that Gorham's confession was obtained in violation of his

Miranda rights, we must still determine whether its admission at trial was harmless error. In his order granting the writ in this case, the entirety of Judge Moran's harmless error discussion was that

I cannot under any circumstances envision a confession of that length and detail being presented to a jury and then be termed harmless error unless the defendant himself got up on the stand and said, 'Yep, it's all true,' and [Gorham] didn't. Remand tr. 168.

■■■■■ This analysis was incomplete and erroneous. To determine whether a given constitutional violation is harmless error, the complete trial record must be considered. It is not enough to say that some or even a lot of tainted evidence was admitted at trial. The court must examine the tainted evidence relative to the valid evidence and determine whether the conviction is valid. Where a confession, otherwise voluntary, is inadmissable for failure to comply with the strict procedural requirements of *Miranda,* reversal is not required if, on the facts in the record, the court can find beyond a reasonable doubt that its use at trial was harmless. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *United States v. Charlton,* 565 F.2d 86, 92 (6th Cir.1977), *cert. denied,* 434 U.S. 1070, 98 S.Ct. 1253, 55 L.Ed.2d 773 (1978); *accord United States v. White,* 607 F.2d 203, 209–210 (7th Cir.1979), *cert. denied,* 449 U.S. 1114, 101 S.Ct. 926, 66 L.Ed.2d 843 (1981); *see Milton v. Wainwright,* 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972). Viewing the record in this case without the defendant's confession, there is still extensive physical and testimonial evidence directly implicating the petitioner in the homicide of Kenneth Thompson.

Kenneth Thompson died on January 10, 1975, of a bullet wound to the head. The bullet entered in the middle portion of the right eyebrow and exited at the back of the head behind the left ear. On the night of the homicide, Kuester and Robustelli recovered a spent .45 caliber shell casing from the floor of Kenneth Thompson's van.

James Olendorf testified that Gorham borrowed a .45 caliber automatic pistol from him in early January 1975. Olendorf later sold this pistol in the middle of January 1975 to William Mick, who testified that in March 1976, after speaking with Olendorf, he stripped the gun of its internal parts and disposed of the barrel, receiver and slide, and disposed of them in the Kankakee River, in Illinois, and in the Yellow River, in Indiana. On April 25, 1976, Mick turned over to the Chicago Heights Police Department the internal parts of the gun that he had kept.

Jack Welty, a firearms examiner with the Illinois Bureau of Identification, compared the spent .45 casing found in Thompson's van with a shell casing fired from a gun containing the internal parts obtained from Mick. Based upon his examination of these casings, Welty concluded that the firing pin impression on the retrieved cartridge only could have been produced by the firing pin obtained from Mick, and thus from the gun which Olendorf loaned to Gorham in January 1975.

Other testimonial evidence also supports Gorham's conviction. Olendorf and Kathleen Thompson both detailed at trial how Gorham had admitted the murder of Kenneth Thompson to them. Kathleen Thompson testified as to how she and Gorham planned the execution of her husband to obtain the insurance proceeds. On the evening of the homicide, she met with Gorham and he told her that he had his alibi together and that she should go somewhere that night to give herself an alibi. At approximately 11:00 p.m. on January 10, 1975, Gorham called her and said that "he had taken care of business." About a week after the funeral, Mrs. Thompson and Gorham began living together. One day, he described the shooting to her in detail. He told her that he had shot Kenneth Thompson, but in his opinion, the victim had not suffered. Gorham proceeded to describe how there was blood all over his coat. At that point, he said he had disposed of his coat, hid the gun and went to Mike Rose's home. Mrs. Thompson bought Gorham a

car, a motorcycle, and a boat with part of the insurance money. Olendorf also testified that in January, 1975, Gorham came to him, said that the police were after him, and that he needed a place to stay. While he was at Olendorf's house, he admitted that "he shot a guy on the hill" with the .45.

We believe that no jury faced with the trial record without Gorham's confession would have found other than the jury in the state trial did. We therefore are fully convinced that the admission of Gorham's confession into this case, even if it would have been obtained in violation of *Miranda*, would have been harmless beyond a reasonable doubt. The district court stressed the fact that Gorham's confession was forty-two pages long supported its conclusion that the confession was not being harmless beyond a reasonable doubt. We disagree with this narrow analysis. Weight of the evidence, not pages of testimony, is the critical aspect of the analysis. As the Supreme Court has stressed, the court is to consider the entire record. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705.[1] As Judge Moran himself admitted, "I have no question in my own mind, as I am sure nobody else has, that Mr. Gorham did what he confessed to doing in the manner in which he confessed it." Rehearing tr. 168.

For the above reasons, we reverse the grant of habeas corpus relief in this case.

REVERSED.

CUDAHY, Circuit Judge, dissenting:

This is certainly the proverbial "hard case," in which a concededly guilty murderer seeks to go free on the strength of a rather marginal *Miranda* violation.

Nonetheless, and with all respect, I have difficulty accepting the majority's rejection of Judge Moran's findings on waiver. The majority says that Judge Moran's findings are "implausible" and it therefore follows that they are "clearly erroneous". But credibility determinations are central to the findings here and the relevant facts are numerous and detailed (as the heft of the majority opinion illustrates). I think it is unacceptable for an appellate court in the name of plausibility, *see Anderson v. City of Bessemer City*, —— U.S. ——, ——, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985), to simply "reinterpret" the evidence. Judge Moran's determination that the police officers' earlier recollections were more credible than their later ones should stand, and ought rightly to survive the majority's notions of plausibility.

The Supreme Court has recently considered a case in which a Court of Appeals failed to give proper deference to the district judge's findings of fact. *Anderson v. City of Bessemer City*, —— U.S. ——, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). In *Anderson* the Court went to some lengths to explain the meaning of the clearly erroneous standard. Its words are particularly relevant here.

> This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently. The reviewing court oversteps the bounds of its duty under Rule 52 if it undertakes to duplicate the role of the lower court. "In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues *de novo*." ....
>
> ....
>
> When findings are based on determinations regarding the credibility of witnesses, Rule 52 demands even greater deference to the trial court's findings; for only the trial judge can be aware of the

---

1. If numbers are our sole criterion for determining harmlessness of error, we must compare Gorham's 42-page confession, which is in the same question-and-answer transcript format as the trial transcript, with Kathleen Thompson's 80-page testimony at trial, Olendorf's 15-page testimony, Mick's 25-page testimony, Welty's 34-page testimony, and the entire state testimony of 375 pages. These numbers, while they dwarf the size of the confession, are not the basis upon which harmless error can be determined.

variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said. This is not to suggest that the trial judge may insulate his findings from review by denominating them credibility determinations, for factors other than demeanor and inflection go into the decision whether or not to believe a witness. Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it. Where such factors are present, the court of appeals may well find clear error even in a finding purportedly based on a credibility determination. But when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error.

*Anderson*, —— U.S. at ——, 105 S.Ct. at 1511 (citations omitted). Gorham's *Miranda* story is not internally inconsistent; it is not implausible on its face; there is no objective or documentary evidence contradicting it. Therefore, unless the majority means to assert that Gorham is a witness whose testimony is, as a matter of law, incredible, belief in his story is permissible. As the majority concedes, quoting *Anderson*, " '[w]here there are two permissible views of the evidence, [here belief in the police version or belief in Gorham's version,] the factfinder's choice between them *cannot* be clearly erroneous' " (emphasis added).

In addition, a harmless error analysis is fraught with difficulty as, I think, the opinion in *Gorham I* suggests. *See* 675 F.2d at 938. Among other things, the ballistics evidence does not involve any material actually retrieved from the murder scene or from the victim.

On the other hand, I would readily concede that justice does not cry out here for grant of the writ. I can appreciate fully those unseemly aspects of this case which may have moved the majority toward the result it reaches on these difficult facts. But in the long run, adherence to settled principles will, I believe, prove the more rewarding course.

I therefore respectfully dissent.