**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Howard Dennis WHITE,
Defendant-Appellant.**

No. 78–1731.

United States Court of Appeals,
Seventh Circuit.

Argued April 6, 1979.

Decided Oct. 17, 1979.

Rehearing Denied Nov. 14, 1979.

Roger D. Rudich, Chicago, Ill., for defendant-appellant.

Thomas P. Sullivan, U. S. Atty., Daniel W. Gillogly, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before SWYGERT and TONE, Circuit Judges, and JAMESON, Senior District Judge.*

JAMESON, Senior District Judge.

Appellant Howard Dennis White was convicted following a jury trial on three counts: (1) possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1); (2) importation of cocaine into the United States, in violation of 21 U.S.C. § 952(a); and (3) unlawfully carrying a firearm during the commission of a felony,

in violation of 18 U.S.C. § 924(c)(2).[1]   We affirm.

### Factual Background

On July 5, 1977, White, who was then in Lima, Peru, arranged through James Plunkett, an exporter living in Lima, to ship a mirror to the United States.  White had the mirror shipped to Steven Marinis, a friend in Houston, Texas, who was involved in the importing business.  White had asked Marinis to check the crated mirror through Customs and then ship it to him in Chicago, Illinois.  When the crate arrived in Houston, Marinis took it to Customs where, upon inspection, the Customs officials found approximately one kilogram of cocaine in packages hidden in the backing of the mirror.

Marinis agreed to participate in a "controlled delivery" of the mirror.  The Customs agents removed all but 16.35 grams of the cocaine.  Marinis then called White in Chicago and informed him the mirror had arrived safely, passed Customs, and would arrive on a Braniff flight at O'Hare Airport at 8:00 P.M. on July 21, 1977.  When the crate arrived at O'Hare Airport it was put under constant surveillance by Drug Enforcement Administration (DEA) agents.  White called Braniff air freight three times that night to see if the crate had arrived and if they would deliver it to him.  Braniff agents told White they could not deliver the crate that evening, nor could they send it to him by taxicab unless they had his written signature authorizing the delivery.

About 7:30 the next morning Kenneth Chrusciel picked up the crate and loaded it into his truck.  DEA agents followed Chrusciel as he left the airport.  They observed White's automobile following Chrusciel.  One group of agents followed Chrusciel when he turned to return to Chicago.

---

* The Honorable William J. Jameson, Senior District Judge of the United States District Court for the District of Montana, is sitting by designation.

1.  White was sentenced to imprisonment for ten years on Counts One and Two and for five years on Count Three, all to be served concur-

rently.  In addition he is required to serve mandatory three-year parole terms on Counts One and Two, also to run concurrently.  A fourth count in the indictment charging possession of a firearm in violation of 18 U.S.C. (App.) § 1202(a)(1), was dismissed on motion of the Government.

Chrusciel was subsequently stopped on his way into Chicago and arrested, and the crate was confiscated.

Another group of agents followed White, who headed back toward the terminal area. White drove through the arrival area once going very slowly and started to make a second run through when the DEA agents stopped him. They ordered him out of the car and placed him under arrest. While giving him a pat-down search, they discovered he was wearing an empty gun holster. Upon searching his car, the agents found a gun in a briefcase on the driver's seat.

When the case was called for trial, White moved to suppress evidence of the gun seized when he was arrested. Following a hearing the district court first granted the motion to suppress, but upon reconsideration denied the motion.

### Contentions on Appeal

In a brief filed by appellant's counsel it is contended that (1) White was indicted in violation of the Speedy Trial Act; (2) the Government failed to prove beyond a reasonable doubt that White had knowledge that the crate shipped from Lima, Peru contained cocaine; (3) the pretrial motion to suppress was erroneously denied; and (4) the admission of evidence regarding the firearm, which appellant argues should have been suppressed, was so prejudicial as to require reversal of the counts involving possession and importation of cocaine.

In a pro se supplemental brief appellant contends further that (1) inaccuracies in the affidavit of the agent used to support issuance of an arrest warrant after White's actual arrest required suppression of the evidence seized at the time of arrest; (2) White was denied effective assistance of counsel; (3) the court erred in admitting evidence of (a) the cocaine seized in Houston, (b) the cocaine seized in Chicago, and (c) White's post-arrest statements.

### Speedy Trial Act

Appellant first contends that the indictment should have been dismissed because he was not indicted within 35 days of his arrest, as required by the applicable time limit in the Speedy Trial Act, 18 U.S.C. §§ 3161(b) and (f) and 3162(a)(1). Appellant was indicted five months after his arrest.

■ This issue was first raised on appeal. This court has many times recognized the general rule that in the absence of plain error the court will not consider an issue not raised in the district court. *See, e. g., Faulisi v. Daggett,* 527 F.2d 305, 310 (7th Cir. 1975); Rule 52(b), F.R.Crim.P. Here there is no showing of plain error; nor does the case come within any recognized exception to the general rule.

■ In any event, the Speedy Trial Act provided that the sanction set out in § 3162 would not become effective until July 1, 1979. 18 U.S.C. § 3163(c). The transition rules were directory only and did not require dismissal. *United States v. Carpenter,* 542 F.2d 1132, 1134 (9th Cir. 1976). Moreover, appellant has not shown how he was prejudiced by the delay.

### Sufficiency of the Evidence

■ Appellant contends that the evidence was insufficient to prove beyond a reasonable doubt that he knew the mirror contained cocaine. He argues that there were times when the mirror was left unguarded at Plunkett's office and consequently, "Any one of innumerable individuals could have tampered with the mirror." The jury obviously rejected this suggestion.

Viewing the evidence as a whole in the light most favorable to the Government, it is clear that there was substantial evidence to support a jury determination that White knew the mirror contained cocaine. He made extensive preliminary efforts to determine procedures for importing merchandise from Peru. The mirror cost $24.00. Instead of bringing it back to the United States with him, which he knew he could do since its value was less than $250.00, White chose to have it shipped by a professional exporter—at considerable added expense. White took the mirror wrapped in brown paper to Plunkett's export shop. Although

it was unattended overnight, Plunkett testified that the paper and mirror were in the same condition and intact when it was crated the next morning. White was present for the crating. There was no suggestion at that time that the mirror was not in the same condition as when he delivered it the day before.

When Marinis called White from Houston to tell him the mirror had arrived, White asked if Marinis had taken a good look at the shipment. When the crate was flown to Chicago, White called Braniff Airlines three times on the night it was due to see if it had arrived. He also attempted, unsuccessfully, to have it delivered to him that night by taxicab. The next morning Chrusciel picked up the mirror for White, but White was also at the airport in his own car, and followed Chrusciel for a short time. These actions are not normal for one who is expecting delivery of a $24 mirror. Additionally, when White was arrested he had a cocaine snorter in his possession. The jury could reasonably infer that White knew the mirror contained hidden cocaine.

### Motion to Suppress Gun

■ At the pretrial suppression hearing DEA Agent Maffett testified that while following White's automobile through the airport area, he observed White lean toward the right seat and make a gesture toward the flap of his coat. Shortly thereafter the DEA agents decided to arrest White. They stopped his automobile, removed him from the vehicle, and while conducting a patdown search found an empty shoulder holster strapped across White's chest. Maffett asked White, "Where is the gun?" White replied, "I don't have a gun. I am just carrying an empty shoulder holster." DEA Agent Morley began to search White's car for the weapon while Maffett handcuffed White. Morley found a briefcase on the front seat of the car but could not open it.

He then searched the glove box, the front seat, the area under the front seat, and the rear seat. In the meantime Maffett took White back to Maffett's car and put him into the back seat. Morley left White's car not having found the weapon, talked with Maffett briefly, and then returned to White's car. He manipulated the combination lock of the briefcase with his thumb and the case opened. Inside was a revolver.

Relying upon *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977) and *United States v. Berry*, 560 F.2d 861 (7th Cir. 1977) *(Berry I)*, the district court initially suppressed the evidence. After being advised that the Seventh Circuit had vacated *Berry I, United States v. Berry*, 571 F.2d 2 (7th Cir. 1978) *(Berry II)*, *cert. denied*, 439 U.S. 840, 99 S.Ct. 129, 58 L.Ed.2d 138 (1979), the district court reversed itself and denied White's suppression motion.[2]

In *Chadwick* federal narcotics agents arrested the defendants outside a train station as the defendants were loading a large footlocker into an automobile. The defendants were searched, and both they and the footlocker were taken to the federal building. There the agents opened the footlocker without a search warrant and found marijuana. The Supreme Court held the warrantless search of the footlocker was impermissible. The Court stated:

> Once law enforcement officers have reduced luggage or other personal property not immediately associated with the person of the arrestee to their exclusive control, and there is no longer any danger that the arrestee might gain access to the property to seize a weapon or destroy evidence, a search of that property is no longer an incident of the arrest.

433 U.S. at 15, 97 S.Ct. at 2485.

The holding in *Chadwick* was considered and clarified in *State of Arkansas v. Sand-*

---

**2.** *Berry I* involved the search of an attache case, belonging to one of the defendants, at the scene of arrest made within eight minutes of the defendant's arrest, but after the defendant had been removed from the area. Relying upon *Chadwick, supra,* the court suppressed

the contents of the briefcase. In *Berry II* the court vacated its prior opinion solely on the basis that it would not retroactively apply *Chadwick* to an arrest and search made prior to its decision. *Berry II*, 571 F.2d at 3.

ers, decided on June 20, 1979, subsequent to oral argument in this case, —— U.S. ——, 99 S.Ct. 2586, 61 L.Ed.2d 235. In *Sanders*, acting upon an informant's information that Sanders, upon arriving at an airport, would be carrying a green suitcase containing marijuana, police officers placed the airport under surveillance. They observed Sanders retrieve a green suitcase, place it in a taxicab, and enter the taxi with a companion. The vehicle was stopped several blocks from the airport. Without obtaining permission from Sanders or his companion, the police opened the unlocked suitcase and discovered marijuana. The trial court denied a motion to suppress the evidence obtained from the suitcase. The Supreme Court of Arkansas, relying on *Chadwick*, reversed. In affirming the Supreme Court of Arkansas, the Court held that in the absence of exigent circumstances, police are required to obtain a warrant before searching luggage taken from an automobile properly stopped and searched for contraband.[3]

The Court recognized the difficulty frequently encountered by courts and law enforcement agencies in discerning the proper application of Fourth Amendment principles "because the circumstances giving rise to suppression requests can vary almost infinitely" and "an apparently small difference in the factual situation frequently is viewed as a controlling difference in determining Fourth Amendment rights." The Court noted earlier cases in which the Court had "sustained the constitutionality of warrantless searches of automobiles and their contents under what has become known as the 'automobile' exception to the warrant requirement," citing *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). The Court in *Sanders* was "presented with the task of determining whether the warrantless search of respondent's suitcase falls on the *Chadwick* or the *Chambers/Carroll* side of the Fourth Amendment line." In holding that *Chadwick* was controlling the Court said in part:

The only question, therefore, is whether the police, rather than immediately searching the suitcase without a warrant, should have taken it, along with respondent, to the police station and there obtained a warrant for the search. A lawful search of luggage generally may be performed only pursuant to a warrant. In *Chadwick* we declined an invitation to extend the *Carroll* exception to all searches of luggage, noting that neither of the two policies supporting warrantless searches of automobiles applies to luggage. Here, as in *Chadwick*, the officers had seized the luggage and had it exclusively within their control at the time of the search. Consequently, "there was not the slightest danger that [the luggage] or its contents could have been removed before a valid search warrant could be obtained." 433 U.S. at 13, 97 S.Ct. at 2484. And, as we observed in that case, luggage is a common repository for one's personal effects, and therefore is inevitably associated with the expectation of privacy. *Ibid.*

99 S.Ct. at 2592.

The Court recognized, however, that "special exigencies" may justify a warrantless search, stating in a footnote:

There may be cases in which the special exigencies of the situation would justify the warrantless search of a suitcase. *Cf. Cady v. Dombrowski*, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973) (police had reason to suspect automobile trunk contained a weapon). Generally, however, such exigencies will depend upon the probable contents of the luggage and the suspect's access to those contents— not upon whether the luggage is taken from an automobile. In the present case the State has conceded that there were no special exigencies. . . .

Nor do we consider the constitutionality of searches of luggage incident to the arrest of its possessor. *See, e. g., United*

---

**3.** Two of the Justices in an opinion concurring in the judgment found the majority opinion

unnecessarily broad, and two Justices dissented.

*States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). The State has not argued that respondent's suitcase was searched incident to his arrest, and it appears that the bag was not within his "immediate control" at the time of the search.

99 S.Ct. at 2593 n.11.

The Government argues that the search in this case was permissible under both exceptions to the warrant requirement, i. e., the search was incident to a lawful arrest and there were special exigencies justifying a warrantless search. We need not decide whether the search could be justified as incident to the arrest. Assuming that it could not, nevertheless there were exigent circumstances that justified the search.

The agents had reason to believe that White had recently had a gun, presumably loaded, in his shoulder holster, and had either hidden the gun within the automobile or thrown it out the window while he was driving through the airport. His action, shortly before he was stopped by the agents, of leaning toward the right seat of the vehicle and making a gesture toward the flap of the coat indicated that he might have placed the weapon in the briefcase. If the weapon were not in the briefcase and had been thrown out of the automobile in a busy airport, it might well "fall into untrained or perhaps malicious hands" and

constitute a danger to the general public. *Cady v. Dombrowski,* 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973).[4] There was sufficient testimony in the record to support this possibility.[5]

The agents had the right and duty to avert possible danger to themselves and the public by finding and holding the gun. The most expeditious way to go about finding it was to search the limited area of the automobile before expanding the search to other areas. It would have been unreasonable to require the agents to search the entire terminal area prior to searching the briefcase in order to find the missing revolver. The need to locate and take possession of a dangerous instrumentality was an exigent circumstance which justified the warrantless search. The motion to suppress was properly denied.[6]

*Issues Raised in Appellant's Pro Se Brief*

We have reviewed all of the additional contentions set forth in appellant's supplemental pro se brief, most of which are first asserted on appeal. None require a reversal.

■ White first contends that his arrest was illegal by reason of "misrepresentation and perjury" in Agent Maffett's affidavit. White, however, was arrested without a warrant and there was probable cause for

---

**4.** As noted *supra, Cady v. Dombrowski* was cited in *Sanders* as an example of a case where "special exigencies" of the situation would justify the warrantless search of a suitcase. Dombrowski had been arrested for drunken driving. About two and one-half hours later an officer, looking for a service revolver which Dombrowski, who identified himself as a Chicago policeman, was thought to possess made a warrantless search of the car finding several items in the trunk which were later offered in evidence. Noting that the "ultimate standard set forth in the Fourth Amendment is reasonableness," 413 U.S. at 439, 93 S.Ct. at 2527, the Court concluded that the intrusion into the trunk of the car in a private garage without a warrant was not unreasonable by reason of "concern for the safety of the general public who might be endangered if an intruder removed a revolver from the trunk of the vehicle." *Id.* at 447, 93 S.Ct. at 2531.

**5.** One of the agents who had been following defendant White prior to stopping and arresting him testified:

> Well, by this time Agent Maffett had brought Dr. White back to Agent Maffett's car and had him in the car. I had gone back to Agent Maffett and told him that the man, Mr. White, obviously had something, a weapon, in the shoulder holster and I think that he threw it out the window . . . .

Transcript at 41–42.

**6.** Having reached this conclusion, it is unnecessary to consider whether there were exigent circumstances under the rule of *United States v. Johnson,* 467 F.2d 630, 639 (2d Cir. 1972), cited in *Chadwick,* 433 U.S. at 15 n.9, 97 S.Ct. at 2485 n.9, as an example of a "possible justifications for a warrantless search of luggage." *Johnson* involved the search of a suitcase containing a sawed-off shotgun in an apartment building in a high crime area.

his arrest. He was later, taken before a magistrate. A complaint and Maffett's supporting affidavit were filed. The magistrate issued a warrant for White's arrest even though White was already in custody.

Maffett admitted at the pretrial suppression hearing that his affidavit erroneously stated that Chrusciel made two trips around the airport complex. There was no evidence, however, that the misstatement was made with the intention of deceiving the court or that it was material to the issue of probable cause. The cases cited by appellant are not in point.

■ White next argues that an arrest warrant was required because the DEA agents had him under surveillance for 24 hours prior to the arrest. 21 U.S.C. § 878(3), however, allows a DEA agent to make a warrantless arrest for any felony cognizable under the laws of the United States, if he has probable cause to believe that the person to be arrested has committed or is committing a felony. At the time of White's arrest the DEA agent had probable cause to believe White was committing a felony—importation of cocaine. Even though they may have had White under surveillance for the 24 hours preceding the arrest and had an opportunity to obtain a warrant, no arrest warrant was required since the agents had probable cause to make the arrest. *See United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976).

■ We find no merit in White's contention that he was denied effective assistance of counsel. On the contrary, he was competently represented by two able and aggressive attorneys. Their representation clearly met the standards recognized by this court in *United States v. Harris,* 558 F.2d 366 (7th Cir. 1977).

White's sole complaint is that his attorneys failed to move to suppress all evidence obtained as a result of "the unlawful warrantless search" of the crate seized pursuant to Chrusciel's arrest. On the basis of the record, however, we conclude that it is unnecessary to reach the merits of this con-

tention. Assuming, arguendo, that the challenged evidence should have been suppressed as fruits of an unlawful search, the record clearly reveals that any error in its admission was harmless beyond a reasonable doubt. *Milton v. Wainwright,* 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972); *Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). The fact that the backing of the mirror contained smuggled cocaine had already been conclusively established through the lawful search Customs officials conducted in Houston. Suppression of the cocaine left in the mirror after the Houston discovery, therefore, would not have aided the defense.

■ We find no merit in White's contention that the court erred in admitting the cocaine seized in Houston. The requisite chain of custody was established, and we find no evidence to support White's suggestion that the evidence was tampered with.

Finally, White contends that the admission into evidence of his statement to the DEA agents, "I don't have a gun. I am just wearing the shoulder holster," requires a reversal of his convictions. White argues that this statement was in response to a question by the agent and was obtained in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

■ White was under arrest when the statement was made, and the district court properly found that there was probable cause to effect the arrest. Since the statement was in no way responsible for White's arrest, it would affect primarily the gun charge, Count Three. From our review of the evidence we conclude that any error in admitting the statement was harmless, particularly with respect to the first two counts—possession and importation of cocaine. We recognize that to hold error harmless, the court must find it "harmless beyond a reasonable doubt." *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). In determining whether there is a reasonable possibility that the error affected the jury's verdict, the court's judgment must be based on what seems to have been the "probable impact of the [er-

ror] on the minds of an average jury," *Harrington v. California*, 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969). We cannot believe that White's statement had any substantial impact on the jury's consideration, even of Count Three.[7]

The convictions on all counts are affirmed.

**7.** Since the gun was lawfully seized, the evidence at trial was concerned with whether White's possession of the gun was unlawful and whether the gun was accessible. White offered evidence to support his contentions that he believed in good faith he was entitled to carry the gun and that it was not immediately accessible to him. The jury was properly instructed on both questions, and they were argued to the jury.