UNITED STATES of America, Plaintiff–Appellee,

v.

Michael D. BAKER, Defendant–Appellant.

No. 94–1304.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 13, 1994.

Decided Nov. 8, 1994.

Ralph M. Friederich, Asst. U.S. Atty. (argued), Criminal Div., Fairview Heights, IL, for plaintiff-appellee.

David M. Williams (argued), Fairfield, IL, for defendant-appellant.

Before POSNER, Chief Judge, MANION, Circuit Judge, and ASPEN, District Judge.*

MANION, Circuit Judge.

Michael Baker was convicted by a jury of one count of conspiracy to distribute cocaine in violation of 21 U.S.C. § 846. Baker raises various challenges to his trial and conviction and sentence, none of which require reversal. We affirm.

## I.

The facts most favorable to the government reveal that Michael Baker began distributing cocaine in the Carterville, Illinois area sometime in 1986. Baker obtained resale quantities of cocaine from his source in Florida and brought the drugs back to Illinois for resale. Baker's Illinois customers, including Danny Holmes, Snyder Bruce Herrin and David Falmier, would in turn distribute the cocaine obtained from Baker to their own customers.

Baker later realized that he could get a higher return on his money if he obtained cocaine by the kilogram. Kilograms cost around $20,000, however, and Baker did not have this kind of money. So Baker approached Holmes, Herrin and Falmier, and proposed that they pool their money to purchase a kilogram. Everyone agreed. Starting in late 1987 or early 1988, they began pooling their money and purchasing bulk quantities of cocaine. The record reveals that Baker entered into several such pooling arrangements with Holmes, Herrin, Falmier and Tommy Loyd, another Illinois distributor with whom Holmes had frequent drug dealings. With this money in hand, Baker, usually accompanied by another codefendant, would drive to Port St. Lucy, Florida and pick up a kilogram from Baker's supplier, someone identified only as "Paul." He would then return to Illinois where each contributor would take his pro rata share of the cocaine. In fact it was after one of these excursions that Baker and Falmier were found in possession of cocaine when they were pulled over for a traffic violation in Illinois on January 20, 1989.

Baker and Falmier were arrested and later charged by Illinois authorities with possession and distribution of cocaine [1]; however, this did not deter Baker and the others from continuing their cocaine cooperative.

---

* Hon. Marvin E. Aspen, of the United States District Court for the Northern District of Illinois, is sitting by designation.

1. Baker was later charged under state law with conspiracy to distribute cocaine. This charge was dropped in exchange for Baker's plea to possession of cocaine.

Following Baker's arrest, Loyd started obtaining cocaine from his niece, Julie Pahl, and her husband, John Pahl, both of whom lived in Coral Springs, Florida. The Pahls sold their cocaine for the same price as the "Paul" in Port St. Lucy (the record indicates that despite the similarity in their names, these were in fact separate suppliers). Loyd financed these purchases by entering into pooling arrangements with Baker, Falmier (both of whom presumably were released on bail), Herrin and Holmes. The pooling system was similar to the ones previously entered into with Baker. Loyd recruited various female drug couriers, including Deloris Lingle, to fly to Coral Springs, Florida to pick up kilograms of cocaine. According to Lingle, she would be met at the airport by the Pahls who, after receiving payment for cocaine, would tape the drugs to Deloris' abdomen. Lingle testified that she would then fly back to Illinois and deliver the cocaine to Loyd at his bar in Blairsville, Illinois. Lingle testified that on numerous occasions she saw Loyd split up the cocaine among himself, Holmes, Herrin, Falmier and Baker. At trial, John Pahl verified Lingle's testimony regarding Loyd's methods of purchasing and transporting the cocaine back to Illinois. John Pahl testified that he sold Loyd a total of 13 kilograms of cocaine. He also testified that Loyd told him that Holmes and Herrin had contributed to the purchase price of several of the kilograms purchased by Loyd. John Pahl stopped supplying Loyd with cocaine shortly after Loyd was arrested in July of 1989.

Following Loyd's arrest, Baker and Holmes, in late 1989, made another trip to Port St. Lucy, Florida to obtain a kilogram of cocaine from "Paul." Baker and Holmes each kicked in $10,000. Upon their return to Illinois, Baker and Holmes took their respective shares of the cocaine and distributed it to their own customers.

On December 16, 1992, a federal grand jury indicted Baker, Holmes, Falmier, and the Pahls, for conspiring to distribute cocaine, in violation of 21 U.S.C. § 846 and 18 U.S.C. § 2. On July 13, 1993, the grand jury returned a superseding indictment against Baker only, charging that, from about January 1987 to January 1990, Baker, along with Loyd, Holmes, Falmier and the Pahls, conspired to distribute cocaine in violation of 21 U.S.C. § 846. Sometime between these two indictments Baker's codefendants pleaded guilty; Baker pleaded not guilty and proceeded to trial. The jury found Baker guilty as charged. The district court sentenced Baker to 141 months imprisonment followed by a five-year period of supervised release.

On appeal, Baker alleges pretrial error stemming from the government's delay in bringing this case to trial. He also challenges the sufficiency of the evidence underlying his conspiracy conviction, and claims that the district court failed to enter specific findings as to the amount of drugs attributable to him for purposes of calculating his base offense level under the Sentencing Guidelines.

## II.

### A. Pre–Indictment Delay

Baker first challenges the district court's refusal to grant his motion to dismiss based on pre-indictment delay. Baker was arrested for state drug charges in Illinois on January 20, 1989; the federal government obtained its first indictment against Baker on December 16, 1992. Baker claims that the federal government's 47–month delay in obtaining its initial indictment substantially prejudiced his ability to mount an effective defense and therefore deprived him of his Fifth Amendment right to due process.

Initially, we point out that the most obvious safeguard against any potential prejudice flowing from the government's delay in seeking an indictment is the applicable statute of limitations. In the case of non-capital federal crimes, such as conspiracy under 21 U.S.C. § 846, Congress has set out a five-year period of repose. 18 U.S.C. § 3282. This reflects a legislative judgment that so long as prosecutions are brought within the designated timeframe, then, notwithstanding the possible loss of crucial evidence or failure of memory, a defendant will be able to adequately defend himself. But Baker has not argued that the government's prosecution was barred by the statute of limitations, and

for good reason: Baker's last act in this conspiracy occurred in late 1989 and the original indictment was returned on December 16, 1992, well within the five-year period of limitations.

The Supreme Court has stated, however, that "the statute of limitations does not fully define [a] [defendant's] rights with respect to events occurring prior to indictment." *United States v. Marion*, 404 U.S. 307, 324, 92 S.Ct. 455, 465, 30 L.Ed.2d 468 (1971). Instead, the Court in *Marion* observed that the Due Process Clause of the Fifth Amendment may provide a check on certain prosecutions, even though brought within the period of limitations, "if it were shown at trial that the pre-indictment delay in [bringing] [the] case caused substantial prejudice to [a] [defendant's] right[ ] to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused." *Marion*, 404 U.S. at 324, 92 S.Ct. at 465; *accord United States v. Sowa*, 34 F.3d 447, 449–50 (7th Cir. Aug. 30, 1994). To make out a due process claim, it is the defendant's burden to establish prejudice with specific, concrete allegations supported by evidence; only after meeting this burden must the government explain the reasons for the pre-indictment delay. *Sowa*, at 450–51.

Baker failed to clear the first hurdle in asserting his claim. Nowhere in Baker's motion to dismiss, nor, for that matter at the hearing on that motion, did he point to anything that could plausibly demonstrate prejudice to his defense. Baker's motion simply alleged that the government's delay was an attempt "to prejudice the Defendant in his defense by relying upon lapses of memory from potential witnesses due to the length of time between gaining the information necessary for an indictment and bringing the indictment." When pressed by the district judge to offer some evidence supporting his claim, Baker's counsel simply reiterated his conclusory allegations of prejudice contained in his motion to dismiss. The district court denied Baker's motion, reasoning that Baker's bare allegations were in themselves insufficient to establish a violation of due process. This determination was correct. *See, e.g., Pharm v. Hatcher*, 984 F.2d 783, 787

(7th Cir.1993) (stating that vague allegations of "faded memory" are insufficient to establish prejudice for the purposes of a due process violation).

Moreover, the district court offered Baker the opportunity to renew his motion at trial and offer evidence in support; yet there is nothing in the record demonstrating that Baker, either at trial or in a post-trial motion, took up the district court's offer. This means that Baker has waived his claim in the district court, and can raise it in this court only if he can demonstrate plain error, "which is to say an error that must be corrected in order to avert a miscarriage of justice." *United States v. Lechuga*, 994 F.2d 346, 351 (7th Cir.) (en banc), *cert. denied,* ⸺ U.S. ⸺, 114 S.Ct. 482, 126 L.Ed.2d 433 (1993). We find no plain error here. In support of his claim, Baker points us to excerpts from the trial testimony of various witnesses, including himself, in which the witness, in responding to a question, states some variation of "I don't recall." After reviewing these responses in context, however, we are not persuaded that any of these demonstrate an inability to answer due to faded memory. Turning first to Baker's own responses, we believe that they are better characterized as evasive and self-serving, and, if anything, reflect an unwillingness to answer. As to the responses of others, we think that each particular witness' inability to answer the question in no way diminished Baker's ability to defend himself; most of the sought-after answers were either irrelevant to defeating the government's conspiracy prosecution or were supplied elsewhere by the testimony of another witness. As such, there is no merit to Baker's claim that the government's pre-indictment delay allowed crucial witnesses' memories to fade and thus hindered Baker's defense.

### B. Speedy Trial Act

Baker next claims that his conviction must be reversed because his trial did not commence within seventy days of his indictment, as required by the Speedy Trial Act, 18 U.S.C. § 3161(c)(1). Specifically, Baker claims that the district court improperly excluded certain periods of time in determining

that the government brought Baker to trial within seventy days of the initial indictment.

■ Baker never brought any of these objections to the attention of the district court. Indeed, Baker never once mentioned the Speedy Trial Act. Baker's motion to dismiss which we mentioned earlier was based entirely upon the government's pre-indictment delay. Furthermore, at no time during the hearing on that motion did Baker ever mention the possibility of a Speedy Trial violation. In *United States v. Samples,* 713 F.2d 298, 302 (7th Cir.1983), this court remarked that the failure to bring Speedy Trial violations to the attention of the district court prohibits our consideration of the issue—period. But in so stating, *Samples* relied upon our earlier decision in *United States v. White,* 607 F.2d 203 (7th Cir.1979), *cert. denied,* 449 U.S. 1114, 101 S.Ct. 926, 66 L.Ed.2d 843 (1981), wherein we merely observed that the failure of the defendant in that case to raise his Speedy Trial contentions before the district court waived all but plain errors. *White,* 607 F.2d at 205. *White* found no plain error and rejected the defendant's contentions. Perhaps implicit in *Samples* is a finding that no plain error occurred in that case. In any event, we think the appropriate standard to review Baker's challenge, as with any other forfeited trial error, is the plain error standard.

We start with some general principles. The Speedy Trial Act requires that the defendant's trial "commence within seventy days from the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs." 18 U.S.C. § 3161(c)(1). In multi-defendant cases, such as the one before us, the seventy-day clock does not start ticking until the last co-defendant has been arraigned. *Henderson v. United States,* 476 U.S. 321, 323 n. 2, 106 S.Ct. 1871, 1873 n. 2; 90 L.Ed.2d 299 (1986). In addition, the act excludes from the seventy-day computation any delay attributable to the filing and resolution of defendant's pretrial motions. 18 U.S.C. § 3161(h)(1)(F). Moreover, "under § 3161(h)(7), the excludable delay of one de-

fendant may be ascribed to all codefendants in the same case, absent severance." *United States v. Tanner,* 941 F.2d 574, 580 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1190, 117 L.Ed.2d 432 (1992).

■ The grand jury returned its first indictment on December 16, 1992. The indictment named five co-defendants, including Baker. The last arraignment of a named co-defendant was that of Holmes on February 9, 1993. Thus, on that date, the seventy-day clock commenced. Starting on February 10, 1993, Baker and the other co-defendants filed a series of pretrial motions, the last of which, Baker's demand for a bill of particulars, was not resolved until October 8, 1993. Consequently, this entire period was properly excluded from the Speedy Trial calculation. Moreover, the fact that the grand jury returned a superseding indictment on July 13, 1993 has no effect on the Speedy Trial calculations in this case. Whenever a superseding indictment merely charges offenses contained in the original indictment or those which for purposes of double jeopardy must be joined to the original offense, the seventy-day period continues to run from the date of the original indictment, and all exclusions apply as if no superseding indictment had been returned. *United States v. Gonzales,* 897 F.2d 1312, 1316 (5th Cir.1990), *cert. denied,* 498 U.S. 1029, 111 S.Ct. 683, 112 L.Ed.2d 675 (1991). This is to prevent the government from circumventing the Speedy Trial guarantees by dismissing and refiling charges against the defendant. *Gonzales,* 897 F.2d at 1316 ("the rule prevents the government from circumventing the speedy-trial guarantee by restarting the speedy-trial clock by obtaining superseding indictments with minor corrections."). That was not the case here. Baker's trial commenced on November 15, 1993, thirty-eight days after the resolution of his motion for a bill of particulars. Thus, Baker's trial commenced within the seventy-day period as required by 18 U.S.C. § 3161(c)(1); hence, no plain error.

## C. Sufficiency of the Evidence

Baker raises a challenge to the sufficiency of the evidence in support of his conspiracy conviction. His main argument is that the

evidence, at best, demonstrates a series of independent spot dealings between him and another co-defendant. Baker contends that neither he nor the other co-defendants had any interest in the other's success. This, he claims, is insufficient evidence to sustain his conviction.

■ At the outset we note that Baker's counsel failed to raise this challenge in the district court either through a timely motion for a judgment of acquittal at the close of the evidence or within the seven-day period following the verdict as prescribed by Fed. R.Crim.P. 29(c). This court has previously observed that failure to do either waives any challenge on appeal to the sufficiency of the evidence absent a manifest miscarriage of justice. *United States v. South,* 28 F.3d 619, 626 (7th Cir.1994) (collecting cases). Furthermore, when asked at oral argument to elaborate on his insufficiency challenge, Baker's counsel indicated that he had never raised such a challenge in his briefs to this court (yet on review of Baker's briefs, we found that he did in fact make this challenge). Nonetheless, the government never argued that Baker may have waived his challenge. Indeed, the government devoted a great deal of its time at oral argument setting out the sufficiency of the evidence supporting Baker's conviction. Therefore, the government has waived Baker's waiver, *United States v. Moya–Gomez,* 860 F.2d 706, 745–46 n. 33 (7th Cir.1988), *cert. denied,* 492 U.S. 908, 109 S.Ct. 3221, 106 L.Ed.2d 571 (1989), meaning that we will review this just like any other claim of evidentiary insufficiency. Thus, we will assess the sufficiency of the evidence as a whole, including all reasonable inferences, and ask whether any rational jury could have found the essential elements of a conspiracy beyond a reasonable doubt. *See United States v. Zarnes,* 33 F.3d 1454, 1465 (7th Cir.1994).

■ The essential element of a conspiracy is "an agreement to commit an unlawful act." *Iannelli v. United States,* 420 U.S. 770, 777, 95 S.Ct. 1284, 1289–90, 43 L.Ed.2d 616 (1975). To convict Baker for conspiracy un-

der 21 U.S.C. § 846, the government had to present evidence demonstrating the existence of an agreement between Baker and another individual to commit a violation of the Controlled Substance Act, in this case possessing cocaine with the intent to distribute it as prohibited by 21 U.S.C. § 841(a)(1). Evidence of this agreement need not be direct; circumstantial evidence will do. *Iannelli,* 420 U.S. at 770 n. 10, 95 S.Ct. at 1286 n. 10; *see also Direct Sales Co. v. United States,* 319 U.S. 703, 714, 63 S.Ct. 1265, 1270–71, 87 L.Ed. 1674 (1943) (same); *Zarnes,* at 1465 (same).

■ From the evidence of these repeated pooling arrangements among Baker and his co-defendants the jury could infer the existence of an agreement among these parties to violate the drug laws. Drugs, like other commodities, are cheaper in bulk. This fact did not escape Baker's notice. When Baker first became involved in the cocaine trade it was not uncommon for him to pay up to $1,750 per ounce of cocaine. Later, Baker learned from "Paul" that if he would buy a minimum of 17 ounces, or a half-kilogram, he could obtain the cocaine for $500 per ounce. Anxious to take advantage of these prices, Baker convinced the others that if they would pool their monies together and purchase kilograms, each would come away with a greater amount of cocaine for the same total amount of money. The evidence shows that Baker and the others entered into several such pooling arrangements over a two-year period, starting sometime in late 1987 and ending with Baker's last trip to Florida with Holmes in late 1989. And there is no question that these arrangements were beneficial to all involved. By chipping in towards a bulk purchase, each contributor[2] came away with an amount of cocaine at a fraction of what that same quantity would have cost if purchased in several smaller transactions. This means that as long as the parties continued working together by pooling their monies and buying in bulk, each would reap greater profits from his subsequent resales than would have been possible had he taken

---

**2.** The government used the term "investors," yet this is a misnomer; these were not persons who passively deposited their money into Baker's co-

caine operation hoping to obtain a decent rate of return on their capital.

only his smaller sum of money and purchased his cocaine elsewhere. From this the jury could infer that each party had a continuing stake in the success of the other party's business. Since the bulk purchase required more money up front, each dealer had to have sufficient sales to generate funds for the next purchase. The shared purchase at bulk price enhanced that goal by allowing increased profits from subsequent sales. On these facts, the jury could infer that there was more going on here than simply disinterested spot-dealing among the parties; instead, this ongoing pattern of pooling, buying and selling demonstrated a level of cooperation going beyond that of isolated and discrete transactions among disinterested parties. Such evidence of a joint endeavor and concerted collaboration among a multiplicity of actors to accomplish the same crime—in this case, possessing cocaine with the intent to distribute it—comes well within the parameters of a conspiratorial agreement. *See Iannelli,* 420 U.S. at 778, 95 S.Ct. at 1290; *Callanan v. United States,* 364 U.S. 587, 593, 81 S.Ct. 321, 325, 5 L.Ed.2d 312 (1960).

We think this conclusion flows from the approach of the Supreme Court in *Direct Sales.* There, the defendant, a mail-order wholesale supplier of morphine, sold its drugs at a considerable discount to large-quantity purchasers. The F.B.I. informed Direct Sales that it was being used as a supplier to physicians convicted for violating the Harrison Act, and that it was selling to physicians quantities of morphine that far exceeded what they could prescribe annually for legitimate use. Direct Sales nevertheless continued selling large quantities to various physicians, including one who was later arrested for illegally peddling vast quantities of morphine obtained from Direct Sales. Direct Sales was charged and convicted under 18 U.S.C. § 371 for conspiracy to violate the Harrison Act. In assessing the sufficiency of the evidence underlying the conviction, the Court reasoned that the defendant's campaign to attract customers through volume-buying discounts had the effect of expanding the market for morphine beyond that which could be put to legal use. This, coupled with the defendant's prolonged cooperation with purchasers who were putting the wares to illegal use, was sufficient to allow a determination that the defendant "had join[ed] both mind and hand to make [such illegal use] possible." *Direct Sales,* 319 U.S. at 713, 63 S.Ct. at 1270. On these facts, the Court concluded, the jury could infer a conspiratorial agreement. *Id.*

■ So too the evidence presented by the government demonstrated that Baker promoted the purchase of bulk⋅ quantities of cocaine, and worked in prolonged cooperation with the other defendants to make it happen. Under *Direct Sales,* this evidence is sufficient to support the conclusion that Baker and the others had joined together to violate the drug laws. We recognize that *Direct Sales* involved a conviction under the general conspiracy statute, 18 U.S.C. § 371. But as observed by the First Circuit in *United States v. Moran,* 984 F.2d 1299 (1st Cir. 1993), "given Congress' intent stamp out drug transactions, it certainly did not mean to narrow the conspiracy concept when it enacted 21 U.S.C. § 846...." *Id.* at 1303–04. We agree and, consequently, using the approach of *Direct Sales,* conclude that the evidence in this case was sufficient to support Baker's conviction.

### D. *Jury Instructions: Theory of Defense* [3]

■ Baker challenges the district court's refusal to incorporate his tendered multiple conspiracy instruction into the court's jury

---

**3.** Baker also raises a challenge to the district court's refusal to tender Baker's conspiracy instruction which would have told the jury, among other things, that "only the Defendant's own words and acts show whether or not he joined [the conspiracy]." Baker failed to raise this objection before the district court, meaning that we will review his challenge for plain error. *See United States v. McKenzie,* 922 F.2d 1323, 1330 n. 4 (7th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 163, 116 L.Ed.2d 127 (1991). The govern-ment, in its brief, points out that since Baker has not demonstrated "that any substantial right was prejudiced ... this issue offers no ground for relief." In his reply brief, Baker's sole rejoinder is as follows: "The Defendant begs to differ with the prosecution's ... statement[.] ...," and then points us back to his initial brief. We consider this a waiver of his argument and consequently will not address it. *Cf. United States v. Teague,* 956 F.2d 1427, 1433 (7th Cir.1992).

charge. Baker claims that this instruction was necessary to his theory of defense presented at trial. We have examined the relevant transcript of the instruction conference, however, and nowhere do we find that Baker informed the district court that this proffered instruction represented his theory of defense. Moreover, after the district court refused Baker's instruction, Baker raised no objection that failing to give this instruction constituted a denial of his right to have the jury consider his theory of defense. Baker has therefore failed to preserve his objections to the district court's refusal as required by Fed.R.Crim.P. 30, which means that we will review his challenge on appeal for plain error only. *See United States v. Canino,* 949 F.2d 928, 940 (7th Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 1940, 118 L.Ed.2d 546 (1992).

■ This challenge need not detain us long. A defendant is entitled to have an instruction covering his theory of defense if he can demonstrate, among other things, that his theory is supported by the evidence. *United States v. Douglas,* 818 F.2d 1317, 1320–21 (7th Cir.1987). Baker's claim that this instruction represented his theory of defense cannot be taken seriously in light of the evidence presented at trial. Throughout his trial, from the opening to closing arguments, Baker's sole defense was that he was a mere user of cocaine, who bought and sold in large quantities in order to support his habit. There is nothing in the trial record indicating that Baker relied upon a multiple conspiracy defense in resisting the government's case. *Douglas* teaches that, in determining whether a theory of the defense instruction is supported by the evidence, "a court must consider whether the defendant has put forth the defense at trial." *Douglas,* 818 F.2d at 1321. We are confident he did not. After reviewing the trial transcript it is apparent that Baker's theory was nothing more than an eleventh-hour idea that materialized at the instruction conference. As there is nothing in the evidence that even remotely supports this theory, the district court committed no error, certainly not a plain one, in refusing to legitimize this theory in the form of a defense instruction.

*E. Refusal to Give Supplemental Instructions*

During deliberations, the jury sent a note to the judge stating that:

We would like clarification of 2 things: 1) the definition of conspiracy says "... a combination of 2 or more persons to accomplish an unlawful purpose[.] ... To be a member of a conspiracy the defendant need not join at the beginning or know *all* the other members...." vs. Count I of the indictment says "Michael D. Baker and unindicted co-spirators [sic] TL, DRH, DAF, JLP, JAP did knowingly combine, conspire [and] agree *together and with each other*...." We need to know if either statement takes precedent over the other statement. Please help us in layman's terms. Thank you.

(Emphasis in original.) After conferring with counsel, the district court issued the following response: "I have given you all the instructions necessary to decide the case. I refer you back to those instructions."

Baker now challenges the district court's response to the jury's request for clarification. His challenge is puzzling. He does not raise the usual challenge to the district court's response, that it was misleading or one-sided in favor of the government. *See* 2 Charles A. Wright, *Federal Rules of Criminal Procedure* § 502 at 831–3 (1982). Instead, he takes issue with that portion of the district court's response which states that the jury has been given all the instructions it needs to decide the case. This isn't so, Baker complains, because they weren't instructed on the possibility of a multiple conspiracy, an essential instruction to this case. It is clear, then, that Baker is just using this as an opportunity to recycle his doomed claim that he was entitled to a multiple conspiracy instruction as his theory of the defense. As such, this challenge is frivolous.

*F. Sentencing Calculations*

Baker challenges the district court's determination that he was responsible for over 15 kilograms of cocaine for purposes of calculating his base offense level under the Sentencing Guidelines. Baker's specific contention is that the district court, in calculating Baker's

base offense level, did not make its own specific findings of record, but rather adopted the conclusory determinations contained in Baker's presentence report. The presentence report on this matter is barren. With respect to Baker's offense level the presentence report simply states: "Base Offense Level: The United States Sentencing Commission Guideline for violation of 21 U.S.C. sec. 841(a)(1) and sec. 846 is found in U.S.S.G. sec. 2D1.1(a)(3) and (c)(5) and calls for a base offense level of 34." Baker maintains that this cannot constitute a specific finding of the relevant quantity of drugs, supported by the evidence, which can be used in setting a base offense level under the Guidelines.

█ From our review of the sentencing transcript, however, we note that Baker's main argument before the district court was not that there was no evidence that could support the presentence report's determination that he was responsible for distributing over 15 kilograms of cocaine; rather, it was to the credibility of the witnesses whose testimony supported that determination. Therefore, we again review Baker's challenge to the district court's failure to enter specific findings for plain error. *See United States v. Goines,* 988 F.2d 750, 777 (7th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 241, 126 L.Ed.2d 195 (1993).

█ Although we agree that the district court should have made specific findings as to the relevant quantity of drugs attributable to Baker before setting his base offense level, *United States v. Perez,* 28 F.3d 673 (7th Cir.1994); *United States v. Montgomery,* 990 F.2d 266, 269 (7th Cir.1993), we think it would be a futile act to vacate Baker's sentence simply because the sentencing court failed to follow proper procedure. This is because the evidence in the sentencing record provides an adequate basis for the determination that Baker was involved in the distribution of over 15 kilograms of cocaine. *Cf. United States v. Carson,* 9 F.3d 576, 585 (7th Cir.1993) (affirming enhancement for defendant's role in the offense under § 3B1.1(a), even though not accompanied by requisite findings, where there was an adequate basis in the record for such a determination), *cert.*

*denied,* —— U.S. ——, 115 S.Ct. 135, 130 L.Ed.2d 77 (1994); *United States v. Blas,* 947 F.2d 1320, 1330 (7th Cir.1991) (stating the same regarding the district court's failure to enter express findings in denying defendant's request for the two-point reduction for acceptance of responsibility under § 3E1.1), *cert. denied,* —— U.S. ——, 112 S.Ct. 1234, 117 L.Ed.2d 468 (1992). Baker was part of the group that kicked in money towards Loyd's purchases of 13 kilograms of cocaine from John Pahl. Holmes testified that he and Baker made two trips to Port St. Lucy, once in late 1988 and again in late 1989, each time bringing back a kilogram of cocaine that would be divvied up among the contributors. This makes 15 kilograms. Add to this the half-kilogram of cocaine in Baker's possession when he and Falmier were arrested following their return from Port St. Lucy on January 20, 1989 and this puts the amount of cocaine over 15 kilograms. Given this, we think the district judge was correct when he determined that the evidence in this case attributed over 15 kilograms of cocaine to Baker which, in turn, supported a base offense level of 34. The upshot of all this is that Baker has failed to demonstrate how the district court's failure to enter on the record specific findings as to the amount of cocaine for which he was responsible had any bearing on the calculation of his base offense level under the Guidelines.

### III.

For the foregoing reasons, Baker's conviction and sentence are AFFIRMED.