# IMPORTANT NOTICE
# <u>NOT TO BE PUBLISHED OPINION</u>

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

RENDERED: MAY 28, 2020
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

## 2019-SC-000438-MR

CHARLES LAMAR RICHARDSON        APPELLANT

ON APPEAL FROM JEFFERSON CIRCUIT COURT
V.        HONORABLE MITCH PERRY, JUDGE
NO. 15-CR-001542

COMMONWEALTH OF KENTUCKY        APPELLEE

## MEMORANDUM OPINION OF THE COURT

### AFFIRMING

A Jefferson County jury found Charles Lamar Richardson guilty of murder, robbery in the first degree, and being a persistent felony offender. The trial court, consistent with the jury's recommendation, sentenced Richardson to life in prison without the possibility of parole for twenty-five years.[1] This appeal followed as a matter of right. *See* KY. CONST. § 110(2)(b). Having reviewed the record and the arguments of the parties, we hereby affirm the judgment of the Jefferson Circuit Court.

---

[1] The jury found that robbery in the first degree was an aggravator under KRS 532.025, justifying the sentence of life without the possibility of parole for twenty-five years.

# I. BACKGROUND

On May 31, 2015, Paul Cason, a seventy-four-year-old man, stopped at a Shell gas station in Louisville. He entered the store, purchased two lottery tickets, and paid for gas. He went back outside for a few minutes and then returned to the store to use the restroom. As he walked towards the door of the gas station to leave, Richardson, who had been loitering at the gas station for approximately thirty minutes, walked up behind Cason, stabbed him in the neck, and then wrestled him to the ground. Richardson bent over Cason and appeared to take something out of Cason's front shirt pocket. Richardson then fled on a bicycle, and Cason died on the floor of the gas station. The lottery tickets Cason had purchased were never found.

The Shell gas station had surveillance video from inside of the store that captured all of the above described events. However, the quality of the surveillance video did not allow for the attacker to be immediately identified. Donald Smith, the store clerk, witnessed the attack and called 911. He initially could not identify the attacker, but eventually identified him as Richardson. He and Richardson are second cousins and were friends on Facebook, but they had not spent time together since they were young children.

The Louisville Metro Police Department ("LMPD") obtained the surveillance video and released a still shot of the video to the media. The still shot showed Richardson, who had yet to be identified, and another unidentified male speaking to each other prior to the stabbing. William Jeffries went to LMPD the next day and identified himself as the person speaking to

2

Richardson in the still shot. He did not know Richardson's full name, but knew him as Charlie B. He had been in prison with Charlie B., knew where Charlie B. worked, and knew that Charlie B.'s brother had recently been killed. From this information, the police were able to identify Charlie B. as Charles Richardson. Detectives showed a photo of Charles Richardson to Jeffries who confirmed that the person in the photo was the person he knew as Charlie B.

Later that day, LMPD police went to Richardson's home and arrested him. Also present in the home was Ashley Marshall. Marshall told police that Richardson had been wearing a black and red jacket but took it off once the police arrived. She also told detectives that Richardson told her that he had robbed somebody when she asked him why the police were there. The police executed a search warrant on Richardson's home and recovered a black and red jacket similar in appearance to the jacket the attacker wore in the Shell station surveillance video.

Richardson was brought to the police station and interviewed by Detective Brian Peters. Richardson denied any knowledge of the incident at the Shell gas station.

Additional facts will be developed as needed for our analysis.

## II. ANALYSIS

On appeal, Richardson makes four claims of error: (1) that the trial court erred in failing to suppress the entirety of his statement to police; (2) that the trial court erred in limiting his cross-examination of the Commonwealth's expert witness; (3) that the trial court erred in admitting cumulative gruesome

3

evidence; and (4) that the trial court erred in refusing to instruct the jury on manslaughter in the first degree as a lesser included offense of murder. We will address each argument in turn.

### A. Richardson's waiver of his *Miranda*[2] rights was voluntary, knowing, and intelligent.

Richardson's first argument is that the trial court erred in failing to suppress his statement to police in total. The trial court did suppress a portion of Richardson's statement, finding that partway through the interview Richardson invoked his right to remain silent. The trial court suppressed all statements made subsequent to this invocation. Richardson, however, argues that the trial court should have suppressed the entire statement, as his *Miranda* waiver was not voluntary, knowing, and intelligent.

"The standard of review for a trial court's ruling on a suppression motion is two-fold. We review the trial court's factual findings for clear error, and deem conclusive the trial court's factual findings if supported by substantial evidence." *Williams v. Commonwealth*, 364 S.W.3d 65, 68 (Ky. 2011) (footnote omitted). The questions of voluntariness as well as knowingness and intelligence of a waiver are then reviewed de novo. *Dillon v. Commonwealth*, 475 S.W.3d 1, 10 (Ky. 2015) (citing *Buster v. Commonwealth*, 364 S.W.3d 157, 162 (Ky. 2012)).

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

In this case, the trial court made the following factual findings in its order granting in part and denying in part Richardson's motion to suppress his statement:

> The defendant was read his *Miranda* rights. However, he was not asked to sign, nor did he sign a waiver of rights. He was asked in a colloquial manner if he wanted to proceed. And, Richardson indicated that he would. Although he denied the crime, or even being present, Richardson did in fact answer questions for several minutes. Subsequently, Richardson did in fact invoke his right to remain silent.

When Detective Peters entered the interview room, he read Richardson his *Miranda* rights from a form. He then said, "Basically, this is just no trickery, okay? I am going to be up front with you. I am going to expect the same in return. Is that cool with you?" Richardson nodded his head up and down several times and made an indistinguishable but audible noise. Detective Peters then asked Richardson questions such as his name, date of birth, social security number, address, and phone number. Following these preliminary questions, Detective Peters began to ask Richardson questions about the incident at the Shell station and Richardson's activities the day before. Richardson answered Detective Peters's questions for several minutes before invoking his right to remain silent. As such, the trial court's factual findings are supported by substantial evidence and therefore are conclusive.

In discussing an effective *Miranda* waiver, we have previously stated:

> To be effective, such a waiver must be made "voluntarily, knowingly and intelligently." *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). That inquiry has two parts, both of which must be shown by the totality of the circumstances. *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct.

1135, 89 L.Ed.2d 410 (1986). First, the waiver "must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.* "Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.*

*Dillon*, 475 S.W.3d at 13. The Commonwealth has the burden to show a proper waiver by a preponderance of the evidence. *Id.* at 14 (citing *Berghuis v. Thompkins*, 560 U.S. 370, 395 (2010)).

Richardson argues that his waiver of his *Miranda* rights was deficient regarding both parts of the test. First, Richardson argues that the detective who interrogated him used "artful deception" to obtain a waiver of his *Miranda* rights, and therefore Richardson's waiver was not voluntary. Second, Richardson argues that under the totality of the circumstances, Richardson did not understand his rights and the consequences of waiving them.

## 1. Voluntariness

Regarding the voluntary element of Richardson's waiver of his *Miranda* rights, Richardson argues that police altered the substantive meaning of the rights by misrepresenting that the rights merely protected him from police "trickery," as opposed to truly advising him of his full rights. He further argues that the police question of "Is that cool with you?" changed what should have been an affirmation that Richardson acknowledged, understood, and waived his rights to a mere acknowledgement that Richardson was "cool" with "no trickery" by the police. Richardson argues that his response is not clearly affirmative, and that the remainder of the interview, in which he eventually

6

asserts his rights, makes clear that he was not "cool" with waiving his rights at the beginning of the interview.

The Commonwealth, on the other hand, asserts that Richardson voluntarily waived his *Miranda* rights, arguing that there was no evidence in the record of improper coercion. The Commonwealth also argues that the fact Richardson later invoked his right to remain silent demonstrates that he in fact understood he had that right and was not coerced into waiving it.

Determining whether a waiver is made voluntarily is difficult. As we have acknowledged,

> Unfortunately, there is no bright-line test, "no talismanic definition of Voluntariness,' mechanically applicable to the host of situations where the question has arisen." *Schneckloth* [*v. Bustamonte*, 412 U.S. 218, 224 (1973)]. At its most basic, a voluntary statement is "the product of a rational intellect and a free will." *Mincey* [*v. Arizona*, 437 U.S. 385, 398 (1978)].

*Id.* at 10. The United States Supreme Court in *Miranda v. Arizona* stated, "[A]ny evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege." 384 U.S. at 476. Richardson argues that he was tricked into waiving his rights by Detective Peters's explanation that his rights merely meant "no trickery."

In support of his argument, Richardson cites to *Leger v. Commonwealth*, in which this Court held that a police officer's assurances of confidentiality vitiated the previously given *Miranda* warnings. 400 S.W.3d 745, 751 (Ky. 2013). In that case, a police officer answered in the affirmative to a direct question about whether the statements the suspect made were going to remain

7

only between the suspect and the police officer, who had been acquaintances for many years. *Id.* at 747. We held that the officer's assurances to the suspect were "the exact opposite of what the proper *Miranda* warning requires. It informed Appellant that what he said to the officer would remain confidential, and, therefore, would not be used against him in court." *Id.* at 749. In *Leger*, we quoted approvingly from a New Jersey court, saying, "A police officer cannot directly contradict, out of one side of his mouth, the *Miranda* warnings just given out of the other." *Id.* at 750 (quoting *State v. Pillar*, 820 A.2d 1, 11-12 (N.J. Super. Ct. App. Div. 2003)). Detective Peters did no such thing in this case.

Richardson also argues that Detective Peters's statement was even more troubling than the detective's statement in *Bond v. Commonwealth* which "somewhat concerned" us. 453 S.W.3d 729, 734 (Ky. 2015). In *Bond*, the detective, prior to reading the suspect his *Miranda* rights, said, "We do this all the time. It's no big deal." *Id.* We acknowledged that taken out of context, the detective's statement "could be construed as minimizing the significance of the rights," but that taken in context, "we [could not] say that it vitiated Bond's **knowing** waiver of his rights." *Id.* (emphasis added). Thus, the detective's statement at issue in *Bond* was relevant to whether Bond **knowingly** waived his rights, not whether he **voluntarily** waived his rights. As such, *Bond* is not instructive to our analysis of whether Richardson voluntarily waived his *Miranda* rights.

8

The United States Supreme Court has held, "The sole concern of the Fifth Amendment, on which *Miranda* was based, is governmental coercion." *Colorado v. Connelly*, 479 U.S. 157, 170 (1986). "The voluntariness of a waiver of this privilege has always depended on the absence of police overreaching." *Id.* Although coercion is often thought of as physical force or psychological threats, our *Leger* case makes clear those things are not necessary. However, the deception referred to by *Miranda* is more than just an inartful summary of the warnings, made after the complete warnings have been read to the suspect, such as happened in this case. The deception must include overreaching to the point of coercion. While Detective Peters's statement to Richardson that there would be "no trickery" is not an accurate summary of the rights protected by *Miranda*, it also did not go so far as to defeat Richardson's rational intellect and free will. This is especially apparent because less than thirty minutes later Richardson unequivocally invoked his right to remain silent. In light of the totality of the circumstances, we hold that Richardson's waiver of his *Miranda* rights was voluntary.

## 2. Knowingness and Intelligence

Regarding the knowingness and intelligence of Richardson's waiver, Richardson argues that under the circumstances, he did not understand his rights or the consequences of waiving them. The Commonwealth, on the other hand, argues that a knowing and intelligent waiver may be implied by Richardson's actions.

To satisfy this prong, "[t]he Commonwealth must show that [Richardson] understood his rights, that is, that his voluntary waiver was also knowing and intelligent. The totality of the circumstances surrounding the interrogation must show the requisite level of comprehension before a court can properly conclude that the *Miranda* rights have been waived." *Dillon,* 475 S.W.3d at 14 (internal citations, quotation marks, and brackets omitted).

Further, while the defendant is "not required to 'understand every possible consequence of a waiver of the Fifth Amendment privilege,' and [is] entitled only to be informed that he was not required to respond to police questions, could have counsel present, and could stop responding at any time," he must also be "capable of integrating these three points in a manner that would allow him to realize that his answers would be used against him in court." *Id.* (quoting *Colorado v. Spring,* 479 U.S. 564, 574 (1987)) (internal citation omitted).

Richardson argues that Detective Peters's statement and subsequent question, "Basically, this is just no trickery, okay? I am going to be up front with you. I am going to expect the same in return. Is that cool with you?" was simple, requiring little analysis to answer, and did not require the complex analysis that the *Dillon* court described was necessary for a waiver of Richardson's constitutional rights. However, the facts in *Dillon* are clearly distinguishable from the facts of this case. In *Dillon,* we described the totality of the circumstances as follows:

10

> Dillon was found on the ground, shot, and at first not responsive. His hands were jerking. He did not answer the officers as they came upon the scene. He was handcuffed, and then raised to a sitting position so the blood could drain out of his mouth. His mouth was full of blood and tissue, and the only words he spoke were to mumble his name. He had a hole in the roof of his mouth, and an exit wound on the top of his head. His eyes were swollen shut. He could respond to short yes-or-no questions.

*Id.* at 15. From those facts, however, we held that the Commonwealth did not meet its burden of showing by a preponderance of the evidence that Dillon knowingly and intelligently waived his *Miranda* rights. *Id.*

Richardson, on the other hand, was read his *Miranda* rights in full and chose to answer Detective Peters's questions. It has been long held that "*Miranda* does not require a 'talismanic incantation' as long as the warnings adequately advise the suspect of his *Miranda* rights." *Ragland v. Commonwealth,* 191 S.W.3d 569, 585 (Ky. 2006) (citing *California v. Prysock,* 453 U.S. 355, 359–60 (1981); *Miranda,* 384 U.S. at 476). Further, an affirmative nod of the suspect's head, which Richardson did here, has previously been held to be an adequate waiver of *Miranda* rights. *See id.* at 586. Finally, "[w]hen a suspect has been advised of his rights, acknowledges an understanding of those rights, and voluntarily responds to police questioning, he may be deemed to have waived those rights." *Id.* (citing *Gorham v. Franzen,* 760 F.2d 786, 795 (7th Cir. 1985); *United States v. Ogden,* 572 F.2d 501, 502–03 (5th Cir. 1978)).

Although Richardson does not argue that he did not waive his rights but instead argues that his waiver was not knowing and intelligent, the above-cited

11

cases are still instructive when reviewing the totality of the circumstances. Richardson acknowledged, by the nod of his head, that he understood his *Miranda* rights and was willing to talk to Detective Peters. It matters not that Detective Peters asked whether Richardson waived his rights in what the trial court described as a "colloquial manner," as Richardson had been fully informed of his rights through the form read by Detective Peters.

Finally, Richardson's actions after being read his *Miranda* rights indicate that he understood those rights. He answered Detective Peters's questions for close to thirty minutes, and then invoked his rights. This invocation indicates that he understood he had rights that he could invoke when he wanted to do so. Therefore, based on the totality of the circumstances, we hold that Richardson knowingly and intelligently waived his *Miranda* rights. As such, the trial court did not err in refusing to suppress Richardson's statements prior to his invocation of his right to remain silent.

## B. The trial court did not abuse its discretion in limiting Richardson's cross-examination of the Commonwealth's fingerprint expert.

Richardson next argues that his due process and confrontation rights were violated when the trial court limited his cross-examination of the Commonwealth's fingerprint expert, Ernie Jones. The LMPD Crime Scene unit recovered a potato chip bag from the Shell gas station that the attacker is seen touching in the surveillance video. Jones testified that he ran the partial print through AFIS, the national fingerprint database. The AFIS system produced a list of thirty possible matches. Jones testified he then personally compared the partial print to each of the possible matches provided to him by AFIS and

12

found that the partial print from the chip bag matched the twenty-fourth print provided by AFIS. The twenty-fourth print from AFIS belonged to Richardson.

On cross-examination, Richardson questioned Jones about the standard he used for establishing a "match" and the standard used by the Federal Bureau of Investigation ("FBI"). Specifically, he questioned Jones on his knowledge that the FBI requires twelve points of comparison to establish a match whereas Jones only used seven points of comparison. Jones explained that there are no set standards for fingerprint analysis, and that different agencies use different standards.

Richardson then asked Jones if he was familiar with the Brandon Mayfield case, and Jones acknowledged that he was. In that case, three FBI examiners and a private forensic examiner all erroneously claimed a 100% match from a print from the Madrid train bombing to a man in Portland, Oregon. Later in the cross-examination, the following exchange occurred between defense counsel and Jones:

> Defense Counsel: Are you aware that because of the evolving science of fingerprint experts the FBI experts are now prohibited from policy from ever saying, "This is a match. This is this person's print"?

> Jones: I believe that what you are talking about is up for discussion in a lot of areas that hasn't been necessarily agreed upon by the community of fingerprints at this time.

> Defense: Sure. I, I would 100% agree that people who are invested in fingerprints are resisting the effort to say, "You can't say 100% match," right?

> Jones: I believe that you have the FBI community doing one thing, and the International Association for Identification that has not agreed to the language yet on it.

13

Defense: Right. So, um, the Department of Justice directs FBI policy.

At this point, the Commonwealth asked to approach the bench. The details of the bench conference are important for our analysis; therefore, we have transcribed the entire exchange.

Commonwealth ("CW"): I object to the challenging of the science of fingerprinting as that should have been done prior to trial.

Defense: It's fair cross-examination, your honor. He's agreeing...

Judge: It is, and it isn't. He's not agreeing, and your questions, as I warned juries, are not evidence. So, wherever you think you are going with this, you can't stand up in closing and say the F, FBI has rejected. He had not agreed with you pro quad.

Defense: He...

Judge: If that's what you're trying to do, to bring, to compare state and federal standards, that's really problematic. And you, we definitely should have proved that up before trial. And I don't even know that's true or not. I've not heard that...

Defense: Well, it is true, but I will ask him for his opinion on that.

CW: His opinion...

Judge: On what?

Defense: On the FBI policy.

CW: Judge, I will object to that.

Defense: He testified he was trained by the FBI.

Judge: He was trained by a lot of people.

Defense: Yes.

CW: But his opinion on the FBI is not relevant. If she wanted to challenge the science of fingerprinting, that should have been done prior to trial. Uh, at, at this stage, she can ask him about his work

14

on this case, but his thoughts on the FBI standards are, any of that, will be irrelevant.

Judge: I will agree. And he's seemingly sandbagged on this, that this is not a federal investigation. He has some course work and what not, but he is not a federal latent fingerprint examiner.

Defense: I understand that. I also intend to ask him about the science underlying the work he's doing.

Judge: Well, that's fair.

Defense: Okay.

Judge: But too, I just, I don't know if you have a good faith belief or not that the FBI, I assume you do, and I'm giving you the benefit of the doubt, but I have never heard that, that the FBI has rejected fingerprint identification.

Defense: I have not said that they rejected fingerprint identification.

Judge: That's what you implied.

Defense: I rejected...they are prohibited from testifying that this is a 100% match.

Judge: Well, that's...

Defense: They can testify there are...

Judge: Counsel, that is very nuanced.

Defense: Commonalities

Judge: And again, your question is not evidence so...

Defense: I understand that.

Judge: So, I'm going to ask you to move on from that and attack the science in state court and not FBI policy. That is not relevant to this prosecution.

Defense: Okay.

Judge: Alright, can you pivot to do that?

15

Defense: Yes.

Judge: Because I sustain that, and I ask you to pivot to something else.

Defense: I understand.

Later, during re-direct examination, the Commonwealth Attorney asked Jones about the Brandon Mayfield case. She asked, "We heard about one case where, um, the particular fingerprint examiners were incorrect. How many cases does it turn out where the fingerprint examiner gets it right?" Jones responds by saying:

> A large portion. The fingerprint case she is talking about, the Brandon Mayfield case, them fingerprints were scanned from a foreign country over a, a copy machine. And I've looked at them fingerprints myself. And they were a low-resolution copy. And that's why today, fingerprints have to be scanned on a higher resolution copier, you see. 'Cause they were scanned on such a poor quality. And that's one of the reasons that the mistake was made also.

Later, on re-cross-examination, defense counsel asked Jones if he was "familiar with the work of Professor Simon Cole" and whether Professor Cole had documented not only Brandon Mayfield's case, but also a number of other cases of misidentified prints. Jones answered in the affirmative to both of these questions. Defense then began, "Okay. And are you familiar with...." The Commonwealth's Attorney interrupted and asked to approach the bench. At the bench, the Commonwealth's Attorney objected on relevancy grounds. After a brief argument by defense counsel and a response from the judge, defense counsel stated, "I'm done with that point, if that matters." The following exchange then occurred:

16

Judge: Yeah, I am going to sustain that, and we should have crossed this bridge well before the trial. The science of latent fingerprinting is not in dispute as far as I am concerned. You are talking about one-off cases. I'm not sure the relevance other than to confuse the jury. So, if you want to pivot to something else again, you can do that. But I will sustain that again.

Defense: Well, my additional question is related in that he testified on re-direct that this, they were scanned prints from another country. I am going to ask him if Robert Moses, the independent examiner, flew to Madrid to see the actual print.

Judge: Sustained. He looked at the fingerprint in this case. That's the point.

Defense: I understand, but she did a re-direct about alleging that the Mayfield case was a mistake only because of the poor quality...

Judge: I understand, counsel.

Defense: And that's not true.

Judge: Well, again, you are talking about other cases that aren't relevant to this.

Defense: It goes to his credibility though.

Judge: I disagree. Still sustained.

We begin our analysis of this issue by making clear that an attack on an expert's credibility by means of attacking the science underlying his opinion is wholly appropriate for cross-examination. We have never held that an attack on the science underlying an expert's opinion can only be done pretrial. Typically, a pretrial attack on an expert's opinion is done through a *Daubert*[3] hearing, in which the opposing party challenges the admissibility of the expert's opinion. If

---

[3] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

17

the expert opinion is admitted at trial, the weight to be given that evidence can still be challenged through cross-examination.

Even in *Daubert*, the United States Supreme Court acknowledged the value of cross-examination of expert witnesses when it stated, "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence....These conventional devices...are the appropriate safeguards where the basis of scientific testimony meets the standards of Rule 702." 509 U.S. at 596 (citing *Rock v. Arkansas*, 483 U.S. 44, 61 (1987)). This Court echoed that same sentiment in *Garrett v. Commonwealth*, when we stated:

> The proper avenue for Garrett to address his concerns about the methodology and reliability of [the Commonwealth's expert]'s testimony was through cross-examination, as well as through the testimony of his own expert. In this way, the jury was presented with both parties' positions, and with any limitations to the testimony, and charged with weighing all the evidence presented.

534 S.W.3d 217, 223 (Ky. 2017). As such, the trial court's statements that Richardson should have attacked Jones's expert testimony pretrial is incorrect. However, that was not the trial court's only basis for excluding the testimony Richardson was seeking to admit; the trial court also found the evidence to be irrelevant and confusing to the jury. We therefore will review the trial court's exclusion of the evidence on those bases.

It is beyond dispute that "[a]n essential aspect of the Sixth Amendment Confrontation Clause is the right to cross-examine witnesses." *Davenport v.*

18

*Commonwealth*, 177 S.W.3d 763, 767 (Ky. 2005) (citing *Douglas v. Alabama*, 380 U.S. 415, 418 (1965)). "Whenever limitations on the right of cross-examination are analyzed, it should be remembered that the right implicated is a fundamental constitutional right and that such limitations should be cautiously applied. Witness credibility is always at issue and relevant evidence which affects credibility should not be excluded." *Commonwealth v. Maddox*, 955 S.W.2d 718, 720–21 (Ky. 1997) (internal citations omitted).

"However, it is equally well established that the right to cross-examination is not absolute and the trial court retains the discretion to set limitations on the scope and subject." *Davenport*, 177 S.W.3d at 767-68. In fact, trial courts can "impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Id.* at 768. A Confrontation Clause violation only occurs when "[a] reasonable jury might have received a significantly different impression of [the witness]'s credibility had [defendant]'s counsel been permitted to pursue his proposed line of cross-examination." *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986). We review a trial court's limitation on cross-examination for abuse of discretion. *Nunn v. Commonwealth*, 896 S.W.2d 911 (Ky. 1995).

In order to determine if the trial court abused its discretion in limiting Richardson's cross-examination of Jones, we must consider the offer of proof made by defense counsel. Kentucky Rule of Evidence ("KRE") 103(a)(2) states:

19

> Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected; and.... If the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked.

In *Henderson v. Commonwealth*, we described an offer of proof and its purpose as follows:

> An offer of proof, generally described as a lawyer "adducing what that lawyer expects to be able to prove through a witness's testimony," serves dual purposes. First, the offer of proof provides the trial court with a foundation to evaluate properly the objection based upon the actual substance of the evidence. And, of equal importance, an offer of proof gives an appellate court a record from which it is possible to determine accurately the extent to which, if at all, a party's substantial rights were affected.

438 S.W.3d 335, 340 (Ky. 2014) (footnote omitted).

In the present case, the Commonwealth made two objections that were sustained by the trial court during bench conferences. During the first bench conference, defense counsel stated that she wanted to ask Jones his opinion on the FBI policy that prohibits its analysts from stating fingerprints are a 100% match. The Commonwealth argued that Jones's opinion on the FBI policy was not relevant, and the trial court agreed. Defense counsel then stated she would ask Jones about the science underlying his opinion, which the trial court stated was "fair." Defense counsel then clarified that she was not implying that the FBI has rejected fingerprint analysis, but only that FBI analysts are prohibited from testifying that fingerprints are a 100% match. The trial judge noted that this was a very nuanced distinction. He ruled that FBI policy was irrelevant and prohibited defense counsel from pursuing that line of questioning any further.

20

Looking closely at the offer of proof provided by defense counsel at this bench conference, we do not believe that the trial judge abused his discretion. Relevant evidence is defined as evidence that "has any tendency to make a fact more or less probable than it would be without the evidence." KRE 401. Jones had already impliedly acknowledged that the FBI had a policy prohibiting its analysts from stating fingerprints matched 100%. In this case, Jones's opinion on that FBI policy simply was not relevant to the guilt or innocence of Richardson or to Jones's credibility.

We next review defense counsel's offer of proof at the second bench conference. Defense counsel wanted to admit evidence that the independent examiner in the Brandon Mayfield case flew to Madrid to personally examine the fingerprint evidence in the Madrid train bombing case. She offered this to impeach Jones's testimony on re-direct that the analysts in that case misidentified the print because they were reviewing a low-quality photocopy of the fingerprint. The trial court found this to be irrelevant and confusing to the jury. Even relevant evidence can be excluded if its probative value is substantially outweighed by a danger of confusing the issues or misleading the jury. KRE 403. In this case, impeachment of Jones on the collateral issue of why analysts erred in an entirely different case did carry a danger of confusing the jury. Therefore, the trial court did not abuse its discretion in excluding this evidence.

## C. The trial court did not abuse its discretion in admitting the store surveillance video and photos of the victim's hands.

Richardson next argues that the trial court abused its discretion in admitting cumulative gruesome evidence. Specifically, Richardson argues that allowing store surveillance video of the stabbing death of Cason to be shown to the jury three times was an abuse of discretion. He also argues that the trial court erred in admitting two photos of Cason's bloody hands that were taken during his autopsy. We review the trial court's admission of this type of evidence for abuse of discretion. *Holbrook v. Commonwealth*, 525 S.W.3d 73, 85 (Ky. 2017) (citing *Meskimen v. Commonwealth*, 435 S.W.3d 526, 534 (Ky. 2013)).

"The general rule is that a photograph, otherwise admissible, does not become inadmissible simply because it is gruesome and the crime is heinous." *Funk v. Commonwealth*, 842 S.W.2d 476, 479 (Ky. 1992). In making admissibility decisions regarding graphic videos or photos, the trial court must undertake an analysis under KRE 403. *Hall v. Commonwealth*, 468 S.W.3d 814, 823 (Ky. 2015). KRE 403 allows relevant evidence to be excluded "if its probative value is substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." This Court has further explained, "[w]hen ruling on the admissibility of a gruesome photograph, the trial court should consider whether evidentiary alternatives would sufficiently prove the fact at issue without a comparable risk of prejudice. However, the evidence must be highly inflammatory and prejudicial to compel a party to

22

employ evidentiary alternatives." *Ratliff v. Commonwealth,* 194 S.W.3d 258, 271 (Ky. 2006) (internal citations omitted).

### 1. Store surveillance video

Richardson first argues that the trial court erred in allowing the store surveillance video showing Cason's stabbing death to be shown to the jury three times. Prior to trial, Richardson made a motion in limine to prevent the Commonwealth from showing the video "with every single witness who gets on the stand." He conceded the video had probative value and that the Commonwealth had "the right to play the video once or twice." However, Richardson asked the court to limit the number of times the Commonwealth showed the video to the jury arguing that it should be played "twice at most." The trial court said "I won't know when it gets too much until it gets too much. We will just watch that."

The store surveillance video was shown in its entirety only once during Richardson's trial, during Donald Smith's testimony. The next day, during Detective Yolanda Baker's testimony, approximately five seconds of the video was shown again. This portion does not appear to depict the actual stabbing, but only depicted Richardson leaving the store, picking up a bike, and fleeing the scene.[4] It did, however, depict Cason lying on the ground immediately after

---

[4] The parties do not state on the record the specific portions (or timestamps) of the surveillance video that were shown to the jury. However, the video recording of the trial includes a portion of the large projection screen set up in the courtroom on which the jury viewed the video. This Court discerned which portions of the surveillance video were shown to the jury by closely watching that projection screen.

23

the stabbing. Finally, during the Commonwealth's closing argument, approximately two minutes of the surveillance video was shown which depicted the moments immediately before Cason was stabbed, the stabbing, and the moments immediately following the stabbing. Richardson did not make contemporaneous objections to any of these presentations.

There can be little argument that the first showing of the video, in full, during Donald Smith's testimony was highly probative. It showed Richardson lingering in the Shell gas station for over twenty minutes. It showed Cason come into the gas station, make a transaction, leave the gas station, and return. It showed Richardson take something out of his pocket and wait for Cason to exit the bathroom. It showed Richardson walk up behind Cason, stab him in the neck, wrestle him to the ground, and presumably take something out of Cason's pocket. It showed Richardson leave the gas station and Cason die on the floor. In sum, it showed the entire crime as it happened.

Although the video was graphic, the Commonwealth had no adequate evidentiary alternatives to showing the actual crime on video. The video's probative value the first time it was shown was so high, there was no danger of it being substantially outweighed by the danger of **undue** prejudice, nor was it cumulative at that point.

The second time the Commonwealth showed a portion of the video was during Detective Baker's testimony. The actual stabbing was not depicted, but Cason's body lying on the floor of the Shell station was shown. This portion of the video was shown during Detective Baker's re-direct examination, in

response to questions she was asked on cross-examination challenging her decision not to search Cason's vehicle. Detective Baker explained she did not think it was necessary to search Cason's vehicle because she could see in the surveillance video that Cason's attacker fled the scene on a bicycle and did not go near Cason's car.

We have previously acknowledged that "the probative worth of each additional gruesome photograph [will] be incrementally discounted as the facts to be proven become ever more certain" and that the "admission of additional photos will also correspondingly increase the danger of undue prejudice." *Hall*, 468 S.W.3d at 826. This incremental decrease in the probative worth of gruesome evidence, however, was not present in the second showing of the surveillance video because that second showing was probative for a different point. It was probative on the issue of why Detective Baker chose not to thoroughly search Cason's car. Richardson argues that Detective Baker adequately described what she saw on the video, making the showing of the video for this point cumulative. We disagree. On balance, the probative value was not substantially outweighed by the potentially inflammatory effects of the showing of the video the second time.

Richardson further argues that the Commonwealth's showing of the video in its closing argument was cumulative and overly prejudicial. Again, we disagree. In general, we grant counsel for both sides wide latitude in closing argument. *Murphy v. Commonwealth*, 509 S.W.3d 34, 50 (Ky. 2017). Further,

25

closing arguments by counsel are not evidence subject to the KRE 403 balancing test.

In conclusion, when viewed within the context of the whole trial, the trial court did not abuse its discretion in allowing the Commonwealth to show the store surveillance video to the jury three times.

## 2. Photos of victim's bloody hands

Richardson also argues that the trial court erred in admitting two photos of Cason's blood-stained hands taken during his autopsy. These photos were admitted during the testimony of Dr. Jeffrey Springer, the medical examiner. Prior to his testimony, Richardson objected to the admission of these photos arguing that they were not probative and were prejudicial. The Commonwealth argued that the photos were probative to show that Cason did not have any defensive wounds on his hands. In reply, Richardson argued that the photos were not probative of a lack of defensive wounds for two reasons: first, medical examiners wash off the blood before determining there are no defensive wounds; and second, it was clear from the Shell surveillance video that Cason would not have defense wounds. The trial court allowed the photos to be introduced, finding they were not prejudicial and suggesting to defense counsel that she cross-examine the medical examiner about whether it would be better to examine a victim's hands after cleaning the blood off of them.

The two photos about which Richardson complains were two of only four photos of the autopsy admitted into evidence by the Commonwealth. The other two photos depicted the knife wound to Cason's neck. In addition to the four

26

autopsy photos, fourteen other photos were admitted: ten photos of blood at the Shell station, two photos of Cason's neck wound taken at the hospital, and two photos of Cason's blood-soaked clothes. Richardson argues that the two photos of Cason's hands were cumulative and unduly prejudicial in the context of the trial and all of the other photos that were admitted.

Richardson further argues that the surveillance video, which clearly shows Cason did not defend himself, and Dr. Springer's testimony were evidentiary alternatives to the photos of Cason's hands to show that he did not have any defense wounds. While this is true and perhaps the probative value of the photos is lower than it would be without those alternative means, this Court will not compel exclusion of evidence and the use of alternative proof unless the proffered evidence is "highly inflammatory and prejudicial." *Hall*, 468 S.W.3d at 824. The photos of Cason's hands are not so gruesome that they require exclusion. Therefore, the trial court did not abuse its discretion in admitting those photos.

### D. The trial court did not abuse its discretion in declining to instruct the jury on manslaughter in the first degree.

Richardson's final argument is that the trial court erred in denying his request to instruct the jury on manslaughter in the first degree as a lesser included offense of murder. We review whether a trial court erred by not giving an instruction that was allegedly required by the evidence for abuse of discretion. *Sargent v. Shaffer*, 467 S.W.3d 198, 203 (Ky. 2015).

We have made clear that "[i]t is always the duty of a trial court to instruct a jury on lesser included offenses when it is so requested and it is

27

justified by the evidence." *Martin v. Commonwealth*, 571 S.W.2d 613, 615 (Ky. 1978). We have also emphasized that a defendant "'is entitled to an instruction on any lawful defense which he has,' including instructions on lesser included offenses." *Allen v. Commonwealth*, 338 S.W.3d 252, 255 (Ky. 2011) (quoting *Hudson v. Commonwealth*, 202 S.W.3d 17, 20 (Ky. 2006)).

More recently, we clarified that "[a]n instruction on a lesser included offense is required only if, considering the totality of the evidence, the jury might have a reasonable doubt as to the defendant's guilt of the greater offense, and yet believe beyond a reasonable doubt that he is guilty of the lesser offense." *Hudson v. Commonwealth*, 385 S.W.3d 411, 416 (Ky. 2012) (quoting *Houston v. Commonwealth*, 975 S.W.2d 925, 929 (Ky. 1998)) (internal quotation marks omitted). Thus, on appeal, the reviewing court asks "whether a reasonable juror could acquit of the greater charge but convict of the lesser." *Allen*, 338 S.W.3d at 255 (citations omitted). In doing so, the reviewing court should "consider[] the evidence favorably to the proponent of the instruction." *Id.* (citations omitted).

Under KRS 507.020(1)(a), "[a] person is guilty of murder when...[w]ith intent to cause the death of another person, he causes the death of such person or another person."[5] Under KRS 507.030(1)(a), "[a] person is guilty of manslaughter in the first degree when...[w]ith intent to cause serious physical injury to another person, he causes the death of such person or of a third

---

[5] The jury was also instructed on wanton murder under KRS 507.020(1)(b) as an alternative theory, but that instruction is not material to this analysis.

person." As can be seen, intent is the key element distinguishing murder from manslaughter in the first degree, as murder requires the perpetrator have the intent to kill while manslaughter in the first degree only requires he have the intent to cause serious physical injury.

Richardson argues that under the evidence presented at trial, a reasonable juror could find that he did not possess the intent to kill Cason when he stabbed him in the neck but merely had the intent to cause serious physical injury. He argues that all of the circumstances surrounding the stabbing are as consistent with an intent to harm as they are with an intent to kill. For example, a reasonable juror is just as likely to believe that he loitered in the gas station so that he could hurt someone as they are to believe that he loitered so that he could kill someone. In essence, he argues that because there was no evidence indicating any particular intention, a reasonable juror could believe beyond a reasonable doubt that he acted with the intent to seriously injure Cason but have a reasonable doubt as to whether he acted with the intent to kill Cason.

Richardson also points to specific testimony from Donald Smith, the Shell station employee, and Dr. Springer, the medical examiner, to support his argument in support of a manslaughter in the first degree instruction. Smith testified that the attacker looked shocked and surprised immediately after stabbing Cason. Richardson argues that if he had the intent to kill Cason, one would not expect him to look shocked and surprised immediately after accomplishing what he intended to do. Dr. Springer testified that Cason died

29

from a single stab wound to his neck that penetrated two to three inches deep, severing an artery and a vein embedded in muscle located in the soft tissue of his neck. Dr. Springer further testified that if the knife had entered Cason's neck at a slightly different angle, it may not have severed the artery and vein, and Cason may have survived. Richardson seems to argue that this testimony could support an inference that he stabbed Cason with only the intent to injure him but unfortunately, the knife entered Cason's neck at an unintended angle which resulted in Cason's death.

The Commonwealth, on the other hand, argues that no evidence introduced at trial indicated that Richardson intended to injure as opposed to kill Cason. Further, the Commonwealth argues that the Shell surveillance video clearly showed Richardson grabbed Cason from behind and "plunged a knife into his neck with great force....with the intent to inflict maximum damage."

"An instruction on a lesser included offense requiring a different mental state from the primary offense is unwarranted unless there is evidence supporting the existence of both mental states." *Taylor v. Commonwealth*, 995 S.W.2d 355, 362 (Ky. 1999). Although in this case the mental state required for both offenses is that of intent, the harm intended is different. However,

> [p]roof of intent in a homicide case may be inferred from the
> character and extent of the victim's injuries. Intent may be inferred
> from actions because a person is presumed to intend the logical
> and probable consequences of his conduct and a person's state of
> mind may be inferred from actions preceding and following the
> charged offense.

*Parker v. Commonwealth*, 952 S.W.2d 209, 212 (Ky. 1997).

30

In this case, no specific evidence was offered from which a reasonable juror could infer that Richardson intended to seriously injure Cason but not to cause his death. Richardson did not testify and therefore did not provide any direct evidence of an intent to seriously injure as opposed to kill. The circumstantial and inferential evidence Richardson cites to is only minimally probative to his mental state. Further, the surveillance video is clear that Richardson attacked Cason from behind, jumping up and purposefully stabbing him in the neck. Reviewing under an abuse of discretion standard, we do not see error in the trial court's finding that no reasonable juror could believe Richardson only intended to injure Cason. Thus, the trial court did not abuse its discretion in declining to instruct the jury on manslaughter in the first degree.

## III. CONCLUSION

For the reasons set forth above, we hereby affirm the judgment of the Jefferson Circuit Court.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Christopher Barrett Thurman
Louisville Metro Public Defender's Office

COUNSEL FOR APPELLEE:

Daniel Jay Cameron
Attorney General of Kentucky

Mark Barry
Assistant Attorney General

31

# Supreme Court of Kentucky

## 2019-SC-000438-MR

CHARLES LAMAR RICHARDSON          APPELLANT

ON APPEAL FROM JEFFERSON CIRCUIT COURT
V.          HONORABLE MITCH PERRY, JUDGE
CASE NO. 2015-CR-01542

COMMONWEALTH OF KENTUCKY          APPELLEE

## ORDER DENYING PETITION FOR REHEARING

The Petition for Rehearing, filed by the APPELLANT, of the Memorandum Opinion of the Court, rendered May 28, 2020, is DENIED.

All sitting. All concur.

ENTERED: August 20, 2020.

_____
CHIEF JUSTICE JOHN D. MINTON, JR.